1

2

3

4

5

6

7

8          UNITED STATES  DISTRICT COURT

9            Northern District of California

10             San Francisco Division

11   JOHN BURNS, et al.,                    No. C 14-00535 LB

12              Plaintiffs,        **ORDER REGARDING**
                                   **DEFENDANTS' MOTIONS TO**
13        v.                       **DISMISS PLAINTIFFS' THIRD**
                                   **AMENDED COMPLAINT**
     CITY OF CONCORD, et al.,
14                                 [Re: ECF Nos. 71, 72, 73]
              Defendants.
15   _____/

16                    **INTRODUCTION**

17        In this action, Plaintiffs John Burns, Tammy Burns, the Estate of Charles Burns, and Bobby

18   Lawrence sued 22 Defendants, who can be broken up into three groups: (1) the City of Concord,

19   City of Concord Police Chief Guy Swanger, City of Concord Police Detectives Chris Loercher and

20   Tom Parodi, and City of Concord Police Officers Mike Hansen, Steven White, Brad Giacobazzi,

21   Danny Smith, Eduardo Montero, Steven Price, Jason Passama, Paul Miovas, Matt Cain, and

22   Matthew Switzer (collectively, the "Concord Defendants")[1]; (2) the City of Antioch, City of Antioch

23   Police Chief Allan Cantando, and City of Antioch Police Officer James Stenger (collectively, the

24   "Antioch Defendants"); and (3) Contra Costa County, Contra Costa County District Attorney Mark

25

26        [1] The court notes that Plaintiffs named City of Concord Detective James Nakayama as a
     defendant in their First Amended Complaint, but they have omitted him as a defendant in the Second
27   Amended Complaint.  In light of Plaintiffs' abandonment of claims against Mr. Nakayama, and
     Plaintiffs' failure to address this issue, which was noted in the Concord Defendants' motion, in their
28   opposition, the court dismisses with prejudice Mr. Nakayama from this action.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Peterson, Contra Costa County District Attorney's Office employee Barry Grove, Contra Costa

2    County Deputy District Attorney Kevin Bell[2], and Contra Costa County Inspector John Conaty

3    (collectively, the "Contra Costa Defendants"). (Third Amended Complaint ("TAC"), ¶¶ 9-31, ECF

4    No. 70.[3]) Plaintiffs also sued Does 1-60, which includes an unnamed City of Concord Police Officer

5    referred to as Doe 1. (*Id.* ¶ 9(b).) Plaintiffs bring claims under 42 U.S.C. § 1983 for violation of

6    Plaintiffs' Fourth and Fourteenth Amendment rights and claims arising under state law. (*Id.* ¶¶ 59-

7    173.) All three groups of Defendants move to dismiss Plaintiffs' Third Amended Complaint.

8    (Concord Motion, ECF No. 71; Antioch Motion, ECF No. 72; Contra Costa Motion, ECF No. 73.)

9    Pursuant to Civil Local Rule 7-1(b), the court found this matter suitable for determination without

10   oral argument and vacated the March 12, 2015 hearing. (3/9/2015 Clerk's Notice, ECF No. 81.)

11   Upon consideration of the record in this case, the parties' moving papers, and the applicable legal

12   authority, the court grants in part and denies in part Defendants' motions as follows.

**STATEMENT**

13

14   **I. PLAINTIFFS' ALLEGATIONS**

15        According to Plaintiffs' Third Amended Complaint, on May 10, 2013, officers of the Concord

16   police department shot and killed Charles Burns, who was John Burns's and Tammy Burns's son, in

17   Antioch, California. (TAC ¶¶ 3, 8-9, 33.) Essentially, their story is as follows.

18        On May 10, 2013, thirteen Concord police officers, acting with the permission of the City of

19   Antioch and with the knowledge and assistance of Contra Costa County Deputy District Attorney

20   Kevin Bell, "planned a surveillance and undercover operation with the intent of arresting and

21   harming Charles Burns." (*Id.* ¶ 34.) On that day, Charles Burns and Mr. Lawrence went to Wal-

22   Mart to buy a "stereo harness" and a Mother's Day card. (*Id.*) They were in Mr. Lawrence's car,

23   and Mr. Lawrence was driving. (*Id.*) "Inexplicably," an undercover Concord police officer drove an

24   unmarked vehicle in a threatening manner toward Mr. Lawrence's car to block its movement. (*Id.*)

25   _____

26        [2] Plaintiffs named 21 Defendants in their Second Amended Complaint. In their Third
     Amended Complaint, Plaintiffs named Kevin Bell as a Defendant as well.

27

28        [3] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations
     are to the ECF-generated page numbers at the top of the documents.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Mr. Lawrence and Charles Burns did not know that a police officer was driving the vehicle, and the

2   officer made no attempt to identify himself as such.  (*Id.*)  Not knowing the situation and perceiving

3   danger, Mr. Lawrence drove down the street to safety.  (*Id.*)  As he did, an undercover officer

4   driving another unmarked vehicle rammed Mr. Lawrence's car.  (*Id.*)  Mr. Lawrence tried to avoid

5   the vehicle and continue down the path towards safety when another undercover officer driving an

6   unmarked vehicle rammed his car.  (*Id.*)  As he rounded Barcelona Circle in Antioch, one of the

7   undercover officers in an unmarked car continued to ram him from the rear.  (*Id.*)  At no time did

8   any of the officers take any action to identify themselves or indicate that the vehicles they were

9   driving as associated in any way with a police agency.  (*Id.*)  It was not until Mr. Lawrence reached

10  the stop sign at the end of the circle that, for the first time, there was any identification that the

11  assailants were police officers.  (*Id.*)  When that happened, Mr. Lawrence stopped the vehicle, which

12  was then rammed again by the undercover officer driving behind Mr. Lawrence.  (*Id.*)  Mr.

13  Lawrence held his hands up and outside the driver's side window in plain view of the officers, thus

14  surrendering to them.  (*Id.*)

15      Charles Burns, the passenger, got out of the car and jogged slow approximately 20 feet to the

16  middle of the road, where he then stopped at the direction of the police officers.  (*Id.*)  He was not

17  armed, carried no weapon or anything that could be construed as a weapon, and took no aggressive

18  action; instead, he yielded to the officers, cowered his shoulders, and put his hands up.  (*Id.*)  Three

19  Concord police officers lined up in firing squad fashion.  (*Id.*)  They were flanked by two additional

20  Concord Police officers, Chris Loercher and unnamed officer.  (*Id.*)  Multiple officers "unloaded

21  their weapons" on the defenseless Mr. Burns with full intent to shoot him.  (*Id.*)  Officers Loercher

22  and the unnamed officer admitted to shooting Mr. Burns.  (*Id.*)  The Concord police officers

23  continued to shoot him even though he was "laying lifeless or near lifeless on the ground," including

24  shooting a bullet through the top of his skull and through his brain.  (*Id.*)  Concord police officer

25  Matthew Switzer then released a K-9 dog to further maim Charles Burns's body.  (*Id.*)  Finally,

26  another Concord police officer walked over to Charles Burns's body, stood over it, and fired an

27  additional two rounds into it "out of pure malice and spite."  (*Id.*)

28      Mr. Bell was present and "a few feet away" when Charles Burns was shot.  (*Id.* ¶ 36.)  Neither

he, nor any Concord police officer, "took any action whatsoever to stop, intervene, call out, take control, or any other action to prevent the killing of Charles Burns," or "to aid Charles Burns by providing medical care, or contacting medical care," even though they could have "[a]t any point in time." (*Id.* ¶¶ 37-38.) "[R]ather[,] they all stood by and participated as the other persons present continued to shoot the hapless [Charles] Burns." (*Id.* ¶ 37.) Plaintiffs allege that Mr. Bell "was acting consistent with a 'police officer' function of investigation as opposed to his prosecutorial function.'" (*Id.* ¶ 20.)

While all of this was happening to Charles Burns, Concord police officers pulled Mr. Lawrence out of his car, physically and verbally threatened him, dragged him across the street, and shoved him into a fence where he was held down, "roughed up," and ridiculed despite not resisting them. (*Id.* ¶ 39.) They did this to him "to interfere with his ability to witness the events being undertaken by the Concord Police Officers to kill Charles Burns." (*Id.*) Then, he was arrested without legal cause and taken to the Antioch police station "where Concord and Antioch officers, and representatives from the Contra Costa County District Attorney's Office held him without legal justification and against his will, and subjected him to aggressive and unwarranted harassment in an effort to elicit false and misleading information from him. (*Id.* ¶ 40.) Concord Police Detective Parodi, Antioch Police Officer Stenger, and Contra Costa County Inspector Conaty screamed at and intimidated Mr. Lawrence, who was under the age of 20, in an attempt to get him to provide a statement that "would conceal the true unlawful and heinous conduct of the officers and cast blame on [Mr.] Lawrence and [Charles Burns." (*Id.*) Contra Costa County District Attorney's Office employee Barry Grove also was present "and provided assistance, oversaw[,] and supervised" Detective Parodi, Officer Stenger, and Inspector Conaty. (*Id.*) All four men knew that Mr. Lawrence was being illegally detained but none of them "intervened, [took] control, stopped[,] or prevented" this from occurring, even though any of them could have. (*Id.*) Chief Contando, Chief Swanger, and District Attorney Peterson also knew about this, and they too failed to take any action to intervene or to prevent further constitutional violations. (*Id.* ¶ 71.) Mr. Lawrence thus "was subjected to hours of unlawful and disturbing interrogation and ultimately released after having to post bail." (*Id.* ¶ 40.) During this interrogation, and under Mr. Grove's direction, Detective Parodi, Officer Stenger, and Inspector

UNITED STATES DISTRICT COURT
For the Northern District of California

Conaty recorded the interview with a digital recording device, but they stopped and started the recording several times during the course of the interview. (*Id.* ¶ 41.) "By doing so, they fabricated a statement that contains information out of context by piecing together different portions of the recording, in order to produce a statement that would attempt to justify the conduct of the offending officers." (*Id.*) "They then produced a falsified written investigative report in order to cover-up the illegal conduct of their fellow law 'enforcement' personnel." (*Id.*)

Plaintiffs allege (for the first time in their Third Amended Complaint) that "[p]rior to the killing of Charles Burns, law enforcement . . . made threats to his family that law enforcement was going to shoot him." (*Id.* ¶ 64(c).) They also allege that "[w]ithin days prior to the killing of Charles Burns, the Concord Officer Defendants (defined as including Detective Loercher (but not Detective Parodi), Officers Hansen, White, Giocabazzi, Smith, Montero, Price, Passama, Miovas, Cain, and Switzer, and Doe 1) and Mr. Bell "met and planned to take down . . . [Charles] Burns, and such planning included the use of lethal force when faced with any level of hesitation on the part of [Charles] Burns." (*Id.* ¶ 64(d).) They "sought to justify their conduct by trumping up the level of sophistication and criminality of the conduct of [Charles] Burns" and by using false information to get, with Mr. Bell's assistance, a warrant for Charles Burns's arrest. (*Id.*) Plaintiffs contend that "[t]he tactics utilized in this case were not the straightforward product of good police practices, but rather were falsely conceived with the intent to justify the use of excessive force up to and including lethal force against Charles Burns, when such use would not otherwise be necessary [or] required . . . . to arrest [him]." (*Id.* ¶ 64(e).) Then, on the day Charles Burns was killed, the Concord Officer Defendants (without Mr. Bell) had a meeting in which they discussed exactly how they were going to "execute the deliberate killing of Charles Burns later that night." (*Id.* ¶ 64(g).)

Plaintiffs also allege that, after Charles Burns was killed and Mr. Lawrence was arrested, the officers at the Antioch Police Department along with the Concord Police Offices and the Contra Costa District Attorney's office then undertook to fabricate information related to the shooting to protect the officers involved and to conceal their illegal conduct. (*Id.* ¶ 42.) The allegations that follow in the complaint specify the following about the alleged conspiracy to (1) protect the Concord police officers who were involved in the shooting of Charles Burns, (2) delay the subsequent

UNITED STATES DISTRICT COURT
For the Northern District of California

investigation of the shooting, and (3) conceal the facts surrounding the events under a "shroud of secrecy." (*See id.* ¶¶ 42-47.) Specifically:

- "Immediately prior to initiating the take down of Charles Burns, [the Concord Officer Defendants] secured the streets surrounding [Charles] Burns['s] home so that there would be no witnesses to their acts." (*Id.* ¶ 64(h).) They also arrived at the scene early, were "in constant communication" and "in constant movement to strategically place themselves, conduct surveillance, and deliberate the preconceived course of attack over 'open air' radio and/or walkie-talkie communication." (*Id.*)

- The Concord police officers, along with the Contra Costa County District Attorney's Office and officers of the Antioch Police Department, "did not follow proper and reasonable police practices in obtaining statements and preserving evidence related to the shooting" of Charles Burns, "purposely did not obtain [or] preserve surveillance and officer obtained video" or video record "all interviews in order to conceal the truth and to conceal their illegal tactics in eliciting information," and did not canvass the neighborhood to determine if neighbors had witnessed the events." (*Id.* ¶ 42.)

- Representatives from the Antioch Police Department and the Contra Costa District Attorney's Office were involved with the investigation and the illegal prolonged detention and arrest of Mr. Lawrence, and they actively participated in the cover-up. "At all times, officers from each agency and the district attorney's office engaged in the unlawful conduct personally and at other times stood by and watched and did not intervene despite a duty" to do so. (*Id.* ¶ 42.)

- "[S]everal Concord Police Officers acted in concert with the Antioch Police Department, the Contra Costa County District Attorney's Office and the Contra Costa County Sheriff's Criminalist District to secure the scene and Charles Burns'[s] body in an effort to conceal their unlawful and malicious conduct." (*Id.* ¶ 43.)

- Defendants made no effort to provide emergency aid to Charles Burns or to contact any third party emergency aid provider prior to his death. (*Id.* ¶ 44.) In fact, "[e]mergency [m]edical providers were purposefully delayed to allow [Defendants] to commence their cover-up efforts and begin planting evidence." (*Id.* ¶ 91.)

- "[I]n an effort to corroborate the fabricated information that [Charles] Burns was reaching for his waistline," "one or more officers planted non-prescribed pills on [Charles] Burns['s] body so that they would be found during the autopsy."  (*Id.* ¶ 97.)

- "Shortly after the killing, [Mr.] Grove, the representative of the District Attorney's [O]ffice (the District Attorney Point Man)[,] showed up on scene[,] and one by one the [Concord police officers] entered and exited the vehicle where [Mr. Grove] was seated[,] and the groundwork was laid for fabricating the story for public consumption and concealing the truth regarding the killing of Charles Burns."  (*Id.* ¶ 44.)

- Detective Parodi, Officer Stenger, and Inspector Conaty, under the direction of Mr. Grove and along with "other defendants," "placed the involved officers in the comfort and solace of hotel rooms while they determined the information known to others and then sought . . . to fabricate the events of the evening" through their interrogation of Mr. Lawrence.  (*Id.* ¶ 45.)

- Detective Parodi, Officer Stenger, Inspector Conaty, and Mr. Grove "coach[ed] the officers to provide statements consistent with a theory exculpating the officers from their willful killing of Charles Burns," "rehearsed their statements[,] and then recorded the statements in a manner to optimize a fabricated version of events."  (*Id.* ¶ 45.)

- Mr. Bell, who was a passenger in Concord Police Office Hansen's vehicle at the time Charles Burns was killed, "assisted the officers engaged in the cover-up by agreeing to and providing" a false statement about the shooting "which failed to contradict the officers['] rendition of events, in particular the locations [Charles] Burns['s] hands and the manner of the shooting and deployment of the K-9."  (*Id.* ¶ 86(f).)  He also "used his position and resources with the District Attorney's office to provide information which was used by" City of Concord Police Officer Mike Hansen "to overstate the history of criminality of Charles Burns, to overstate the level of criminal sophistication of Charles Burns, [and] to overstate the risks and dangers associated with the execution of the warrant in order to justify use of excessive resources and excessive force."  (*Id.* ¶ 86(d).)

- The Concord Police Department has at no time since Charles Burns's death "sought to gain information inculpating the officers in wrongful conduct or search[ed] for the truth."  (*Id.* ¶

1    46.)

2    • A "shroud of secrecy" has surrounded the case and investigation.  Concord and Antioch

3        police officers "took at least 6 months to carry out the coordinated effort to complete their

4        reports, and [they] did so as a concerted action with representatives from the Contra Costa

5        County District Attorney's Office."  (*Id.* ¶ 47.)

6    • "Having knowledge that involving a neutral third party investigative agency would expose the

7        misconduct of the officers," the Concord Police Department and the Contra Costa District

8        Attorney's Office continued "their concerted effort to conceal the misconduct" by refusing to

9        "turn this investigation over to a neutral third party."  (*Id.* ¶ 50.)

10    Plaintiffs allege that Defendants' concerted effort was made possible by "a County Wide law

11   enforcement policy called the 'LEIFI Protocol.'"  (*Id.* ¶ 48; *see also id.* ¶¶ 112-25 (alleging further

12   details).)  "LEIFI" stands for "Law Enforcement Involved Fatality Investigation."  (*Id.* ¶ 112.)

13   Plaintiffs allege that

14          The "Protocol" has been represented as being conceived as a means for deploying
            multiple law enforcement agencies and resources to conduct a swift, efficient[,] and
15          transparent investigation involving police officer misconduct.  However[,] in reality
            the "Protocol" has provided the law enforcement community in Contra Costa County
16          with a powerful tool for covering up police misconduct.  The supervisors in the law
            enforcement community, including Chief Swanger, Chief Conta[n]do[,] and District
17          Attorney Peterson have adopted and continue to employ the "Protocol" knowing that
            it would serve as a means for their subordinates to work together to conceal police
18          misconduct and despite being aware that the "Protocol" has continually been used in
            such a manner.  Swanger, Conta[n]do[,] and Peterson were likewise aware that the
19          "Protocol" was in fact being used in the same illegal and abusive manner in this case
            and despite this knowledge allowed the abusive and illegal conduct to occur.  The
20          "Protocol" is a façade.  The ["P]rotocol["] is intended to give the appearance of
            propriety by having several agencies involved in an investigation on what is supposed
21          to appear as a checks and balances between the various agencies.  However[,] in
            reality the "Protocol" is utilized in Contra Costa County as a means for establishing
22          conspiratorial and concerted effort by law enforcement agencies to protect one
            another when officers unlawfully harm and kill citizens.  This policy is consistent
23          with a long standing practice by law enforcement agencies in Contra Costa with the
            support of the [Contra Costa County] District Attorney's Office of engaging in
24          unconstitutional conduct permeating their activities under the disposition that the
            "Ends Justifies the Means."  This concerted effort in this instance was further
25          facilitated by the fact that the [Contra Costa County] District Attorney, Mark
            Peterson, received substantial donations and support from the Concord Police
26          Department during his campaign for the District Attorney position.  In fact[,] the
            Concord Police Department was the only Police Department in Contra Costa County
27          that endorsed his campaign for District Attorney.  As a result[,] he directed his office
            to take[] steps to facilitate the cover-up of the Concord Police Officer[s'] misconduct
28          in this case, and ignored requests by Plaintiffs to turn the investigation over to an

UNITED STATES DISTRICT COURT
For the Northern District of California

1    independent law enforcement agency.

2    (*Id.* ¶ 49.)  Plaintiffs further allege that "[Contra Costa County] District Attorney Mark Peterson,

3    Chief Swanger[,] and Chief Conta[n]do have personally authorized and maintained the existence of

4    the 'Protocol' for covering up police misconduct in general and specifically in this case by their

5    actions and omissions" and by their "failure to step in and hold the wrong-doers accountable for the

6    misconduct that occurred in this case." (*Id.* ¶ 86(b).)

7        Plaintiffs also allege that the City of Concord, the City of Antioch, and Contra Costa County

8    maintained policies and customs exhibiting deliberate indifference to the constitutional rights of

9    individuals subjected to excessive force and other misconduct. (*See id.* ¶¶ 107-68.)  As for the City

10   of Concord, Plaintiffs allege that "[i]t was the policy and/or custom of the City of Concord to

11   inadequately supervise and train its police officers, including the defendant Officers, thereby failing

12   to adequately discourage further constitutional violations on the part of its police officers." (*Id.* ¶

13   129.)  Specifically, the City of Concord "did not require appropriate in-service training or re-training

14   of officers" "who were known to have engaged in police misconduct involving excessive force and

15   false arrest" or "on issues of use of force, use of lethal force, arrest procedures, execution of

16   warrants, and other related duties," like "conducting under cover investigations" and using "lethal

17   force [against] person accused of felonies." (*Id.* ¶¶ 129, 132.)  Plaintiffs allege that the City of

18   Concord "had prior knowledge of the propensity of the Individual Officers in this case to engage in

19   unlawful acts in violation of persons['] constitutional rights" but continued to employ them

20   nevertheless. (*Id.* ¶ 133.)  "[O]fficers engaged in undercover work as part of the Special

21   Investigations Bureau" ("SIB") (such as City of Concord Police Detective Loercher and City of

22   Concord Police Officers Hansen, White, Giacobazzi, and Smith, *see id.* ¶ 9), "are given free reign to

23   engage in unconstitutional conduct which is tolerated and authorized within the department." (*Id.* ¶

24   135.)  Plaintiffs also allege that the City of Concord uses the LEIFI Protocol "for the purpose of

25   covering up police misconduct, including law enforcement[-]involved fatalities," and "to protect its

26   officers from prosecution for their misconduct." (*Id.* ¶¶ 113-14; *see id.* ¶ 117.)  Lastly, Plaintiffs

27   allege that Chief Swanger, who "is a policy maker for the City of Concord," "authorized, directed,

28   and ratified the actions of the Individual defendant Officers" (presumably the Concord Officer

C 14-00535 LB
ORDER

1    Defendants).  (*Id.* ¶¶ 110-11.)

2        As for the City of Antioch and Contra Costa County, Plaintiffs allege that "[i]t was the policy

3    and/or custom" of the Antioch Police Department to inadequately supervise and train its officers,

4    and of the Contra Costa County District Attorney's Office to inadequately supervise and train its

5    investigators, "regarding proper and lawful police misconduct investigations, and to instruct them to

6    assist local law enforcement in concealing misconduct, thereby failing to adequately discourage

7    further constitutional violations on the part of its investigators."  (*Id.* ¶¶ 143, 159.)  Specifically, the

8    Antioch Police Department and the Contra Costa County District Attorney's Office "did not require

9    appropriate in-service training or re-training of officers on the subject matter of lawful and proper

10   police misconduct investigations" or "on issues of use of force, use of lethal force, arrest procedures,

11   execution of warrants, and other related duties for which they would ordinarily be called upon to

12   conduct investigations."  (*Id.* ¶¶ 143, 147, 159, 161.)  Plaintiffs allege that the Antioch Police

13   Department and the Contra Costa County District Attorney's Office "had prior knowledge of the

14   propensity of the Concord Police Department and Concord Police Officers to engage in unlawful

15   acts in violation of persons['] constitutional rights, particularly with regard to excessive force," "and

16   notwithstanding that knowledge agreed to participate in the investigation per the [LEIFI] Protocol

17   for the purpose of covering up the constitutional violations of the officers."  (*Id.* ¶¶ 148, 162.)  With

18   respect to Contra Costa County, Plaintiffs allege that "there is a long history of tolerating the

19   infringements of citizens['] constitutional rights by law enforcement agencies, supported by the

20   District Attorney's Office," like "special investigations units such as . . . East NET, CNet, and other

21   undercover narcotics investigation units similar to the SIB unit in this case."  (*Id.* ¶ 149.)  Finally,

22   Plaintiffs allege that Chief Contando, who "is a policy maker for the City of Antioch," "authorized,

23   directed[,] and ratified the actions of the Antioch Police Officers and the Concord Police Officers

24   acting within his jurisdiction."  (*Id.* ¶ 164.)  They also allege that Contra Costa County District

25   Attorney Peterson, who "is a policy maker for the County of Contra Costa," "authorized, directed[,]

26   and ratified the actions of the District Attorney's Office Investigators."  (*Id.* ¶ 152.)

27   **II. PROCEDURAL HISTORY**

28        Plaintiffs instituted this action on February 4, 2014 and thereafter filed a First Amended

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    Complaint as a matter of right.  (Complaint, ECF No. 1; FAC, ECF No. 11.)  Upon Defendants'

2    motions, the court dismissed the First Amended Complaint without prejudice because it did not

3    comport with the notice pleading standings under Rule 8(a), in that it did not clearly specify the

4    specific claims against each Defendant.  (7/22/2014 Order, ECF No. 46 at 5-8.)  Plaintiffs thereafter

5    filed a Second Amended Complaint.  (SAC, ECF No. 48.)  Upon Defendants' motions, the court

6    dismissed many (but not all) of Plaintiffs' claims, some with prejudice and some without prejudice.

7    (11/6/2014 Order, ECF No. 67.)

8         Plaintiffs thereafter filed a Third Amended Complaint.  (TAC, ECF No. 70.)  In it, they bring

9    nine claims, which are summarized in the chart below:

| No. | Claim | Brought By | Brought Against |
|-----|-------|-----------|-----------------|
| 1 | 42 U.S.C. § 1983 for the violation of "Plaintiff's" 4th Amendment rights to be free from unlawful seizure and excessive force and "Plaintiff's" 14th Amendment right to the provision of emergency medical care | Estate of Charles Burns | "Concord Officer Defendants" (which Plaintiffs defined as including Detective Loercher (but not Detective Parodi), Officers Hansen, White, Giocabazzi, Smith, Montero, Price, Passama, Miovas, Cain, and Switzer, and Doe 1) and Mr. Bell |
| 2 | 42 U.S.C. § 1983 for the conspiracy to violate "Plaintiff's" 4th Amendment rights to be free from unlawful seizure and excessive force and "Plaintiff's" 14th Amendment right to the provision of emergency medical care | Estate of Charles Burns | "Concord Officer Defendants" (which Plaintiffs defined as including Detective Loercher (but not Detective Parodi), Officers Hansen, White, Giocabazzi, Smith, Montero, Price, Passama, Miovas, Cain, and Switzer, and Doe 1) and Mr. Bell |
| 3 | 42 U.S.C. § 1983 for the violation of Mr. Lawrence's 4th amendment rights "by means of illegal detention, prolonged unjustified detention, unlawful arrest, and false imprisonment" | Bobby Lawrence | All individual, non-entity Defendants |

UNITED STATES DISTRICT COURT
For the Northern District of California

United States District Court
For the Northern District of California

| 4 | 42 U.S.C. § 1983 for the violation of John Burns's and Tammy Burns's 14th Amendment rights to familial association | John Burns; Tammy Burns | "Concord Officer Defendants" (which Plaintiffs defined as including Detective Loercher (but not Detective Parodi), Officers Hansen, White, Giocabazzi, Smith, Montero, Price, Passama, Miovas, Cain, and Switzer, and Doe 1) and Mr. Bell |
|---|---|---|---|
| 5 | 42 U.S.C. § 1983 for the conspiracy to deny court access to John Burns, Tammy Burns, and Bobby Lawrence | John Burns; Tammy Burns; Bobby Lawrence | All individual, non-entity Defendants |
| 6 | 42 U.S.C. § 1983 (*Monell v. Department of Soc. Servs.*, 463 U.S. 658 (1978)) | All Plaintiffs | City of Concord |
| 7 | 42 U.S.C. § 1983 (*Monell v. Department of Soc. Servs.*, 463 U.S. 658 (1978)) | All Plaintiffs | County of Contra Costa |
| 8 | 42 U.S.C. § 1983 (*Monell v. Department of Soc. Servs.*, 463 U.S. 658 (1978)) | All Plaintiffs | City of Antioch |
| 9 | Battery | Estate of Charles Burns | "Concord Officer Defendants" (which Plaintiffs defined as including Detective Loercher (but not Detective Parodi), Officers Hansen, White, Giocabazzi, Smith, Montero, Price, Passama, Miovas, Cain, and Switzer, and Doe 1) |

The Concord Defendants, Antioch Defendants, and Contra Costa Defendants each filed motions to dismiss the Third Amended Complaint. (Concord Motion, ECF No. 71; Antioch Motion, ECF No. 72; Contra Costa Motion, ECF No. 73.) Plaintiffs filed oppositions to the motions, and Defendants filed replies. (Opposition to Concord Motion, ECF No. 76; Concord Reply, ECF No. 78; Opposition to Antioch Motion, ECF No. 75; Antioch Reply, ECF No. 79; Opposition to Contra Costa Motion, ECF No. 77; Contra Costa Reply, ECF No. 80.) On March 9, 2015, pursuant to Civil

1   Local Rule 7-1(b), the court found the motions suitable for determination without oral argument and

2   vacated the March 12, 2015 hearing.  (3/9/2015 Clerk's Notice, ECF No. 81.)

## ANALYSIS

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief.  *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quotation and citation omitted).

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face.  *See Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 557.).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff.  *See id*. at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

If the court dismisses the complaint, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990)).  But when a party

UNITED STATES DISTRICT COURT
For the Northern District of California

1  repeatedly fails to cure deficiencies, the court may order dismissal without leave to amend.  *See*

2  *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992) (affirming dismissal with prejudice where

3  district court had instructed *pro se* plaintiff regarding deficiencies in prior order dismissing claim

4  with leave to amend).

5  **II. DISCUSSION**

6    **A. Claim One**

7      Claim One is brought by the Estate of Charles Burns against the "Concord Officer Defendants"

8  (who Plaintiffs define as Detective Loercher (but not Detective Parodi), Officers Hansen, White,

9  Giocabazzi, Smith, Montero, Price, Passama, Miovas, Cain, and Switzer, and Doe 1), and Mr. Bell.

10  The Estate of Charles Burns brings the claim under 42 U.S.C. § 1983 for the violation of the Estate

11  of Charles Burns's 4th Amendment rights to be free from unlawful seizure and excessive force and

12  the Estate of Charles Burns's 14th Amendment right to the provision of emergency medical care.

13      The Concord Officer Defendants do not move to dismiss this claim, but Mr. Bell does.  He

14  argues that Plaintiffs allege only that he was there when Charles Burns was killed and Mr. Lawrence

15  was arrested, but they do not, and cannot, allege that he caused the constitutional violations.

16      A defendant may be liable to a plaintiff in a section 1983 action if the defendant "subject[ed], or

17  cause[ed] to be subjected," the plaintiff to the deprivation of his constitutional rights.  42 U.S.C. §

18  1983; *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) ("In a § 1983

19  action, the plaintiff must . . . demonstrate that the defendant's conduct was the actionable cause of

20  the claimed injury.") (citing *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981)).  To meet

21  this causation requirement, the plaintiff must establish both causation-in-fact (which is sometimes

22  also known as actual causation), and proximate causation (which is sometimes also known as legal

23  causation).  *Harper*, 533 F.3d at 1026 (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th

24  Cir. 1996); *Arnold*, 637 F.2d at 1355).  "The inquiry into causation must be individualized and focus

25  on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to

26  have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).  As

27  the Ninth Circuit has explained:

28      A person "subjects" another to the deprivation of a constitutional right, within the

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1
2
3
4
5

meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.  Moreover, personal participation is not the only predicate for section 1983 liability.  Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable.  The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

6

7   *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978).

8       It follows that  "[b]eing a mere bystander" to a constitutional violation is insufficient to support

9   section 1983 liability.  *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th Cir. 1996) (rejecting "the 'team

10  effort' standard [that] allows the jury to lump all the defendants together, rather than require it to

11  base each individual's liability on his own conduct"); *see also Jones v. Williams*, 297 F.3d 930, 936

12  (9th Cir. 2002) ("We decline to require an instruction that would invite a jury to find all of the

13  officers liable for an alleged constitutional violation merely for being present at the scene of an

14  alleged unlawful act.").  "For instance, an officer who arrives at the scene after the unconstitutional

15  act is completed, or an officer who provides crowd control at the scene, are not integral

16  participants."  *Bresaz v. County of Santa Clara*, No.: 14-CV-03868-LHK, at *4 (N.D. Cal. Mar. 17,

17  2015) (citing *Blankenhorn*, 485 F.3d 463, 481 n.12 (9th Cir. 2007)).  "Nor is an officer who

18  interviews a witness in the front yard of a building, and does not participate in the unconstitutional

19  search of the building 'in any fashion,' an integral participant."  *Id.* (citing *Hopkins*, 573 F.3d at

20  770).

21      Instead, an individual's "liability under section 1983 is predicated on his 'integral participation'

22  in the alleged violation."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007)

23  (citing *Chuman*, 76 F.3d at 294-95).  "'[I]ntegral participation' does not require that each officer's

24  actions themselves rise to the level of a constitutional violation."  *Boyd v. Benton County*, 374 F.3d

25  773, 780 (9th Cir. 2004).  "But it does require some fundamental involvement in the conduct that

26  allegedly caused the violation."  *Blankenhorn*, 485 F.3d at 481 n.12 (citing *Boyd*, 374 F.3d at 780)

27  (holding that every officer who provided armed backup for another officer who unconstitutionally

28  deployed a flash-bang device to gain entry to a suspect's home could be held liable for that use of

excessive force because "every officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flashbang was to be deployed")).

Citing Paragraph 36 of the Third Amended Complaint, Plaintiffs argue, with respect to the Fourth Amendment claim, that Mr. Bell "was not merely present when Charles Burns was struck down[,] . . . he was actively involved in the planning[] and implementation of the operation." (Opposition to Contra Costa Motion, ECF No. 77 at 12.)  That operation "was set in motion by the actions of [Mr.] Bell and was executed with him present."  (*Id.* (citing TAC ¶ 36).)  On their own, however, the allegations found in Paragraph 36 of the Third Amended Complaint are not sufficient: Plaintiffs allege only that Mr. Bell "was personally present" when Charles Burns was killed and "was actively involved in the planning and implementation of the operation."  (TAC, ¶ 36.)  That Mr. Bell was present at the scene does not make him a cause of the Fourth Amendment violation, *see Chuman*, 76 F.3d at 294-95, and the allegation that he "was actively involved in the planning and implementation of the operation" is vague on its own.  Still, Plaintiffs' other allegations regarding Mr. Bell, which the court must accept as true and construe in the light most favorable to Plaintiffs at this stage of the litigation, provide support for the claim.[4]  Plaintiffs allege that the Concord Officer Defendants "planned a surveillance and undercover operation with the intent of arresting and harming Charles Burns" with Mr. Bell's knowledge and assistance.  (*Id.* ¶ 34.)  They also allege that, "[w]ithin days prior to the killing of Charles Burns," the Concord Officer Defendants and Mr. Bell "met and planned to take down . . . [Charles] Burns, and such planning included the use of lethal force when faced with any level of hesitation on the part of [Charles] Burns."  (*Id.* ¶ 64(d).)  Part of the planning, they allege, included "trumping up the level of sophistication and criminality of the conduct of [Charles] Burns" and using false information to get, with Mr. Bell's assistance, a warrant for Charles Burns's arrest" that would "justify the use of

---

[4] The Contra Costa Defendants argue in their reply that "[t]here are no allegations that [Mr.] Bell directed the actions of the Concord police officers," *see* Reply, ECF No. 80 at 3, but this misses the point.  The case law does not require Mr. Bell to have "directed" the officers who committed the alleged Fourth Amendment violation; it requires only that Mr. Bell to have been an "integral participant" in it.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  excessive force up to and including lethal force against Charles Burns, when such use would not

2  otherwise be necessary [or] required . . . to arrest [him]."  (*Id.* ¶ 64(d)-(e); *see also id.* ¶ 86(d)

3  (alleging that Mr. Bell "used his position and resources with the District Attorney's office to provide

4  information which was used by" City of Concord Police Officer Mike Hansen "to overstate the

5  history of criminality of Charles Burns, to overstate the level of criminal sophistication of Charles

6  Burns, [and] to overstate the risks and dangers associated with the execution of the warrant in order

7  to justify use of excessive resources and excessive force.").)  Under the applicable legal authority,

8  this is enough to show that Mr. Bell was an integral participant.  *See Boyd*, 374 F.3d at 780;

9  *Johnson*, 588 F.2d at 743-44.  Thus, the court will not dismiss at this time the Estate of Charles

10  Burns's first claim against Mr. Bell insofar as it is based on a Fourth Amendment violation.

11      As for the Estate of Charles Burns's Fourteenth Amendment claim based on Mr. Bell's alleged

12  deliberate indifference to Charles Burns's medical needs, the Contra Costa Defendants argue that

13  Plaintiffs do not allege that he detained Charles Burns or took Charles Burns into custody, such that

14  Mr. Bell could be liable for such a claim.  The court agrees.  As one district court has summarized:

15      A pretrial detainee's claim of failure to provide care for serious medical needs is
         analyzed under the substantive due process clause of the Fourteenth Amendment.

16      *Simmons v. Navajo County, Az.*, 609 F.3d 1011, 1017 (9th Cir. 2010); *Lolli v. County
         of Orange*, 351 F.3d 410, 418-419 (9th Cir. 2003); *see Gibson v. County of Washoe*,

17      290 F.3d 1175, 1187 (9th Cir. 2002), *cert. denied*, 537 U.S. 1106, 123 S.Ct. 872, 154
         L.Ed.2d 775 (2003).  "With regard to medical needs, the due process clause imposes,

18      at a minimum, the same duty the Eighth Amendment imposes: 'persons in custody
         ha[ve] the established right to not have officials remain deliberately indifferent to

19      their serious medical needs.'"  *Gibson*, 290 F.3d at 1187 (quoting *Carnell v. Grimm*,
         74 F.3d 977, 979 (9th Cir. 1996)).  "Under the Eighth Amendment's standard of

20      deliberate indifference, a person is liable for denying a prisoner needed medical care
         only if the person 'knows of and disregards an excessive risk to inmate health and

21      safety.'"  *Gibson*, 290 F.3d at 1187 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837,
         114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

22
23      The two-part test for deliberate indifference requires the plaintiff to show (1) "'a
         serious medical need' by demonstrating that 'failure to treat a prisoner's condition

24      could result in further significant injury or the unnecessary and wanton infliction of
         pain,'" and (2) "the defendant's response to the need was deliberately indifferent."

25      *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974
         F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v.

26      Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).

27      Deliberate indifference is shown by "a purposeful act or failure to respond to a
         [detainee's] pain or possible medical need, and harm caused by the indifference."

28      *Jett*, 439 F.3d at 1096 (citing *McGuckin*, 974 F.2d at 1060).  Deliberate indifference
         may be manifested when officials "deny, delay or intentionally interfere with medical

C 14-00535 LB
ORDER

1   treatment." *Jett*, 439 F.3d at 1096 (citing *McGuckin* 974 F.2d at 1060 (internal quotations omitted)).

2

3       "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  Indifference to "medical needs must be substantial.

4   Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.

5   1980).  Under the deliberate indifference standard, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm

6   exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970, 128 L.Ed.2d 811.  "But if a person is aware of a substantial risk of serious

7   harm, a person may be liable for neglecting a [detainee's] serious medical needs on the basis of either his action or his inaction." *Gibson*, 290 F.3d at 1188 (alteration in

8   original).  "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established."

9   *McGuckin*, 974 F.2d at 1060.

10  *Lanier v. City of Fresno*, No. CV F 10-1120 LJO SKO, 2010 WL 5113799, at *7 (E.D. Cal. Dec. 9,

11  2010).

12      Here, Plaintiffs allege that, even though Mr. Bell was present and "a few feet away" when

13  Charles Burns was shot, he did not take "any action whatsoever to stop, intervene, call out, take

14  control, or any other action to prevent the killing of Charles Burns" or "to aid Charles Burns by

15  providing medical care, or contacting medical care," even though he could have "[a]t any point in

16  time." (*Id.* ¶¶ 36-38.)  But as the Contra Costa Defendants point out, Plaintiffs do not allege that Mr.

17  Bell detained Charles Burns or took Charles Burns into custody.  While Plaintiffs allege that Mr.

18  Bell "was acting consistent with a 'police officer' function of investigation as opposed to his

19  prosecutorial function," *id.* ¶ 20, Mr. Bell, as a prosecutor, does not have a "police officer" function

20  that would have allowed him to detain or arrest Charles Burns.  In their opposition, Plaintiffs suggest

21  that because Mr. Bell (as they allege) participated in the unlawful seizure of and use of excessive

22  force against Charles Burns, Mr. Bell also can be said to have participated in the detention of

23  Charles Burns, *see* Opposition ECF No. 77 at 13, but the court does not believe that these concepts

24  can be equated in this situation, and Plaintiffs provide no authority suggesting otherwise.

25  Accordingly, the court dismisses with prejudice the Estate of Charles Burns's first claim against Mr.

26  Bell insofar as it is based on a Fourteenth Amendment violation.

27      **B.  Claim Two**

28      Claim Two is brought by the Estate of Charles Burns against the Concord Officer Defendants

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  (defined as described when discussing Claim One), and Mr. Bell.  The Estate of Charles Burns

2  brings the claim under 42 U.S.C. § 1983 for <u>conspiracy</u> to violate the Estate of Charles Burns's 4th

3  Amendment rights to be free from unlawful seizure and excessive force and the Estate of Charles

4  Burns's 14th Amendment right to the provision of emergency medical care.

5  Both the Concord Officer Defendants and Mr. Bell move to dismiss this claim on the ground that

6  Plaintiffs simply have not sufficiently alleged a conspriracy.  Although the court agreed with this

7  argument regarding previous iterations of the complaint, the court believes that Plaintiffs have

8  alleged enough this time.

9  "To establish liability for a conspiracy in a § 1983 case, a plaintiff must 'demonstrate the

10  existence of an agreement or meeting of the minds' to violate constitutional rights." *Crowe v.*

11  *County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoting *Mendocino Envtl. Ctr.*, 192 F.3d at

12  1301).  "Such an agreement need not be overt, and may be inferred on the basis of circumstantial

13  evidence such as the actions of the defendants." *Id.* (quoting *Mendocino Envtl. Ctr.*, 192 F.3d at

14  1301) (quotation marks omitted).  "Whether defendants were involved in an unlawful conspiracy is

15  generally a factual issue . . . ." *Mendocino Envtl. Ctr.*, 192 F.3d at 1301-02 (citation omitted).

16  Nevertheless, "the plaintiff must state specific facts to support the existence of the claimed

17  conspiracy." *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989) (citing *Coverdell v. Dep't*

18  *of Soc. and Health Servs.*, 834 F.2d 758, 769 (9th Cir. 1987)); *see also Maceachern v. City of*

19  *Manhattan Beach*, 623 F. Supp. 2d 1092, 1110 (C.D. Cal. 2009).  "To be liable, each participant in

20  the conspiracy need not know the exact details of the plan, but each participant must at least share

21  the common objective of the conspiracy." *Crowe*, 608 F.3d at 440 (quoting *United Steelworkers of*

22  *Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (en banc)) (quotation marks

23  omitted).  In addition, a plaintiff must show that an "actual deprivation of his constitutional rights

24  resulted from the alleged conspiracy." *Hart v. Parks*, 450 F.3d 1059, 1071–72 (9th Cir. 2006)

25  (quoting *Woodrum v. Woodward County.*, 866 F.2d 1121, 1126 (9th Cir. 1989)) (quotation marks

26  omitted).

27  The court believes that Plaintiffs have alleged sufficient circumstantial facts to support a

28  conspiracy claim.  As the court recounted above when discussing Claim One, Plaintiffs allege that

UNITED STATES DISTRICT COURT
For the Northern District of California

1   the Concord Officer Defendants "planned a surveillance and undercover operation with the intent of

2   arresting and harming Charles Burns" with Mr. Bell's knowledge and assistance; "[w]ithin days

3   prior to the killing of Charles Burns," the Concord Officer Defendants and Mr. Bell "met and

4   planned to take down . . . [Charles] Burns, and such planning included the use of lethal force when

5   faced with any level of hesitation on the part of [Charles] Burns"; and part of the planning included

6   "trumping up the level of sophistication and criminality of the conduct of [Charles] Burns" and

7   using false information to get, with Mr. Bell's assistance, a warrant for Charles Burns's arrest" that

8   would "justify the use of excessive force up to and including lethal force against Charles Burns,

9   when such use would not otherwise be necessary [or] required . . . to arrest [him]."  (*Id.* ¶¶ 34, 64(d)-

10  (e); *see also id.* ¶ 86(d).)  Plaintiffs also allege that "[i]mmediately prior to initiating the take down

11  of Charles Burns, [the Concord Officer Defendants] secured the streets surrounding [Charles]

12  Burns['s] home so that there would be no witnesses to their acts."  (*Id.* ¶ 64(h).)  In addition,

13  Plaintiffs allege that "[p]rior to the killing of Charles Burns, law enforcement . . . made threats to his

14  family that law enforcement was going to shoot him."  (*Id.* ¶ 64(c).)  The Concord Defendants try to

15  minimize this allegation by pointing out that Plaintiffs do not identify who, exactly, made this threat,

16  and Plaintiffs respond in their opposition by saying that the threat was made by Concord Police

17  Officer Eduardo Montero (one of the Concord Officer Defendants).  Although Plaintiffs do not

18  identify Officer Montero as the threat-maker in their Third Amended Complaint, the court believes

19  that Plaintiffs' allegation is good enough and that it would be a waste of time and resources to

20  require Plaintiffs to file yet another complaint to do so.  Even so, the court finds that the allegation

21  supports Plaintiffs' conspiracy claim anyway.

22      In short, the court finds Plaintiffs' allegations, which, again, the court must accept as true and

23  construe in the light most favorable to Plaintiffs at this stage of the litigation, sufficiently allege a

24  conspiracy claim against the Concord Officer Defendants and Mr. Bell.  Assuming the allegations to

25  be true, the circumstantial evidence is sufficient to infer that the Concord Officer Defendants and

26  Mr. Bell agreed to use excessive force against Charles Burns and shared that common objective,

27  even if all of them did not know the exact details of the plan.  *See Crowe*, 608 F.3d at 440.  This is

28  enough.

**C.  Claim Three**

Claim Three is brought by Mr. Lawrence against all of the individual, non-entity Defendants. Mr. Lawrence brings the claim under 42 U.S.C. § 1983 for the violation of his Fourth Amendment rights "by means of illegal detention, prolonged unjustified detention, unlawful arrest, and false imprisonment."  None of the individual Defendants associated with the City of Concord or the City of Antioch move to dismiss this claim, but the individual Defendants associated with Contra Costa County—Mr. Peterson, Mr. Grove, Mr. Bell, and Mr. Conaty—move to dismiss the claim on the ground that Plaintiffs have not alleged that they caused the constitutional violations Mr. Lawrence complains of.

The Contra Costa Defendants previously made this argument with respect to Plaintiffs' Second Amended Complaint, and the court found it persuasive.  After setting forth the causation standard for section 1983 claims, the court wrote:

> The Contra Costa County Defendants say that, according to Plaintiffs' allegations, of the three individual Contra Costa Defendants (District Attorney Peterson, District Attorney's Office employee Grove, and Inspector Conaty), only Inspector Conaty had any personal involvement with Mr. Lawrence, the only Plaintiff bringing this claim. They then argue that Inspector Conaty's alleged conduct—screaming at and intimidating Mr. Lawrence in an attempt to get him to provide a statement that "would conceal the true unlawful and heinous conduct of the officers and cast blame on [Mr.] Lawrence and [Charles] Burns," and "fabricat[ing] a statement" from Mr. Lawrence by starting and stopping a digital recording device several times and then splicing together separate pieces of information out of their original context to produce a "falsified written investigative report" that supported the "cover-up" of Charles Burns's killing—does not support a claim based on an alleged "illegal detention, prolonged unjustified detention, unlawful arrest, and false imprisonment," which is what Mr. Lawrence's claim is based upon.  Inspector Conaty, they say, was not involved with the arrest and detention of Mr. Lawrence; that was done by the Concord Defendants and the Antioch Defendants.  Inspector Conaty, on the other hand, simply interrogated Mr. Lawrence (albeit in a manner that Mr. Lawrence did not like) while he was being detained.
>
> The court agrees with the [Contra Costa County] Defendants that Plaintiffs have not alleged that District Attorney Peterson and District Attorney's Office employee Grove were personally involved with the arrest and detention of Mr. Lawrence and that Inspector Conaty's interrogation of him does not support the claim brought by Mr. Lawrence.  In their opposition, Plaintiffs highlight their allegation that Mr. Grove "showed up on scene and one by one the [Concord police officers] entered and exited the vehicle where [Mr. Grove] was seated and the groundwork was laid for fabricating the story for public consumption and concealing the truth regarding the killing of Charles Burns," SAC, ECF No. 48 ¶ 39, but that allegation does not bear upon Mr. Lawrence.  Plaintiffs also say that Contra Costa County Deputy District Attorney Kevin Bell was involved in the arrest of Mr. Lawrence.  *See* Opposition, ECF No. 64 at 12-13.  Plaintiffs did allege this, *see* SAC, ECF No. 48 at ¶¶ 33, 74,

UNITED STATES DISTRICT COURT
For the Northern District of California

1   but Mr. Bell is not a defendant to this claim (or this action), so it is irrelevant.  Thus,
    the court concludes that Claim Three must be dismissed without prejudice as to
2   District Attorney Peterson, District Attorney's Office employee Grove, and Inspector
    Conaty.  *See Shallowhorn v. Molina*, 572 Fed. Appx. 545, 546 (9th Cir. May 15,
3   2014) ("The district court properly dismissed Shallowhorn's claims against Warden
    Hedgpeth because Shallowhorn failed to allege Hedgpeth's personal involvement
4   with any constitutional violation.") (citing *Barren v. Harrington*, 152 F.3d 1193,
    1194 (9th Cir. 1998) ("Liability under § 1983 must be based on the personal
5   involvement of the defendant.")). . . .

6   (11/6/2015 Order, ECF No. 67 at 23 (footnote omitted).)

7        The court does not believe that Plaintiffs' addition of Mr. Bell as a defendant to this action or

8   Plaintiffs' additional allegations regarding Mr. Peterson, Mr. Grove, Mr. Bell, and Mr. Conaty

9   change the court's conclusion.  As for Mr. Bell, all of Plaintiffs' allegations regarding Mr. Bell's

10  participation relate to the acts taken against Charles Burns, not Mr. Lawrence.  Plaintiffs allege that

11  Mr. Bell helped plan the arrest of Charles Burns by meeting with the Concord Officer Defendants

12  and by exaggerating Charles Burns' dangerousness to justify an excessively large show and use of

13  force, but none of these allegations have anything to do with Mr. Lawrence.  With respect to Mr.

14  Lawrence, Mr. Bell was a "mere bystander" to Mr. Lawrence's arrest and thus is not subject to

15  section 1983 liability.  *Chuman*, 76 F.3d at 294-95.  As for Mr. Peterson, Mr. Grove, and Mr.

16  Conaty, Plaintiffs' allegations regarding the interrogation are not materially different than those in

17  the Second Amended Complaint.  Plaintiffs allege that these Defendants "knew" that Mr. Lawrence

18  was being illegally detained and were "involved" with it, but Plaintiffs never allege how they knew

19  this or how they were involved with it.  Plaintiffs allegation in this regard are completely

20  conclusory.  In fact, as the Contra Costa County Defendants point out, Plaintiffs never allege which

21  agency or person arrested and detained Mr. Lawrence.  Moreover, even if Mr. Peterson, Mr. Grove,

22  and Mr. Conaty "knew" or were "aware" that Mr. Lawrence was being illegally detained, this would

23  not suffice for liability under section 1983 because knowledge or awareness, alone, does not

24  demonstrate participation.

25       Accordingly, the court dismisses Mr. Lawrence's claim against Mr. Peterson, Mr. Grove, Mr.

26  Bell, and Mr. Conaty.  The court understands that Plaintiffs are trying to state claims as best they can

27  with the information they have.  While that does now change this outcome, the court will set a

28  deadline for amending the pleadings to add claims or parties that allows sufficient discovery into the

UNITED STATES DISTRICT COURT
For the Northern District of California

1    events of May 10, 2013 so that Plaintiffs may amend the pleadings if necessary to conform to the

2    evidence.  *See* Fed. R. Civ. P. 15(a).  For now, though, the court dismisses Mr. Lawrence's claim

3    without prejudice to the extent it is brought against Mr. Peterson, Mr. Grove, Mr. Bell, and Mr.

4    Conaty.[5]

5        **D.  Claim Four**

6        Claim Four is brought by John Burns and Tammy Burns against the Concord Officer Defendants

7    (defined as described when discussing Claim One), and Mr. Bell.  They bring this claim under 42

8    U.S.C. § 1983 for the violation of their 14th Amendment rights to familial association.  The Concord

9    Defendants do not move to dismiss this claim, but Mr. Bell does.  In doing so, Mr. Bell relies on his

10   arguments about why Claim One and Claim Two fail.  The court, however, found above that Claim

11   One (to the extent based on a violation of the Fourth Amendment) and Claim Two survive against

12   Mr. Bell.  Mr. Bell also argues that even if John Burns and Tammy Burns could sufficiently allege a

13   claim against him, he is entitled to qualified immunity because "it would have been objectively

14   reasonable for [him] to believe probable cause existed for detaining a felony suspect fleeing police

15   officers who were attempting to serve a search warrant."  (Contra Costa Motion, ECF No. 73 at 20.)

16   But as the court described above, Plaintiffs allege that Mr. Bell did much more than this, and Mr.

17   Bell's one-sentence qualified immunity argument does not reach nearly far enough to cover it all.[6]

18   Accordingly, the court finds that Charles Burns and Tammy Burns' claim against Mr. Bell survives.

19       **E.  Claim Five**

20       Claim Five is brought by John Burns, Tammy Burns, and Mr. Lawrence against all of the

21   individual, non-entity Defendants.  They bring this claim under 42 U.S.C. § 1983 for conspiracy to

23       [5] Because the court dismisses the claim against Mr. Peterson, Mr. Grove, Mr. Bell, and Mr.
24   Conaty with prejudice, the court does not address whether they are entitled to qualified immunity.
     (*See* Contra Costa Motion, ECF No. 73 at 17-20.)
25

26       [6] Mr. Bell says in Section IV.D of his motion that he is entitled to qualified immunity "[f]or
     the same reasons discussed in Section IV.D., supra."  This does not make sense as he refers to the
27   same subsection.  Regardless, Mr. Bell also did not argue in any previous section that Mr. Bell was
     entitled to qualified immunity.  Mr. Bell's (as opposed to other Defendants') entire qualified
28   immunity argument is quoted above.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    deny court access to John Burns, Tammy Burns, and Bobby Lawrence.  All of the individual, non-

2    entity Defendants move to dismiss the claim on the ground that the claim is not ripe.  The court

3    agrees.

4          "The Supreme Court held long ago that the right of access to the courts is a fundamental right

5    protected by the Constitution."  *Delew v. Wagner*, 13 F.3d 1219, 1222 (9th Cir. 1998) (citing

6    *Chambers v. Baltimore & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907)).[7]  For backward-looking denial

7    of access claims (such as this one), where an underlying claim allegedly "cannot now be tried (or

8    tried with all material evidence) because official action "caused the loss or inadequate settlement of

9    a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some

10   particular order of relief," "the complaint must identify a remedy that may be awarded as

11   recompense but not otherwise available in some suit that may yet be brought."  *Christopher v.*

12   *Harbury*, 536 U.S. 403, 413-15 (2002).  This is because "[t]here is, after all, no point in spending

13   time and money to establish facts constituting denial of access when a plaintiff would end up just as

14   well off after litigating a simpler case without the denial-of-access element."  *Id.*  For this reason, the

15   Ninth Circuit has made clear that, to prevail on a backward-looking denial of access claim that is

16   based on a defendant's "cover-up" of evidence, a plaintiff must demonstrate that the defendant's

17   cover-up rendered other available remedies ineffective.  *Delew*, 143 F.3d at 1223 (dismissing

18   without prejudice the plaintiff's denial of access claim because the plaintiff was currently pursuing

19   an action based on the underlying claim (wrongful death) and it was not yet clear whether the

20   defendants' alleged cover-up rendered that action ineffective).

21         A plaintiff cannot do this when an action based on the underlying claim is pending.  In *Karim-*

22   *Panahi v. Los Angeles Police Dep't*, for example, the plaintiff brought both a Fourth Amendment

23   unreasonable search and seizure claim and a denial of access claim.  839 F.2d 621, 625 (9th Cir.

24   1988).  The denial of access claim alleged that the defendants, who also were named in the Fourth

25   _____

26         [7] As the Supreme Court itself has noted, "[d]ecisions of this Court have grounded the right of
     access to courts in the Article IV Privileges and Immunities Clause, the First Amendment Petition

27   Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection
     and Due Process Clauses."  *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (internal

28   citations omitted).

Amendment claim, falsified facts and destroyed evidence and documents, which resulted in obstruction of justice. *Id.* at 625. The Ninth Circuit said that "[s]uch allegations may state a federally cognizable claim provided that defendants' actions can be causally connected to a failure to succeed in the present lawsuit." *Id.* "However," it went on, "if plaintiff were to succeed in this suit, then his cover-up allegations would be mooted." *Id.* (citations omitted). "Because the ultimate resolution of the present suit remain[ed] in doubt," the Ninth Circuit determined that the plaintiff's "cover-up claim [wa]s not ripe for judicial consideration." *Id.* The Ninth Circuit thus concluded that the plaintiff's denial of access claim should have been dismissed without prejudice. *Id.*; *see also Waiton v. City of Santa Rose*, No. 13-cv-03218-JST, 2014 WL 3362160, at *2-3 (N.D. Cal. July 7, 2014) (dismissing without prejudice a plaintiff's cover-up-based denial of access claim because he could not, at that time, allege "that any defendant's actions prevented him from pursuing or perfecting a case in the courts"); *Carr v. Her*, No. 2:09-cv-0826 GEB KJN P, 2012 WL 259457, at *12 (E.D. Cal. Jan. 25, 2012) ("A cover-up claim is premature when, as here, plaintiff's action seeking redress for the underlying constitutional violations remains pending.").

Plaintiffs' cited authorities do not help them. *Carey v. Piphus*, 435 U.S. 247 (1978) involves the award of nominal damages for a procedural due process claim, not a denial of access claim. *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983), acknowledges that a denial of access claim may be brought, but it says nothing about when it ripens, and to the extent it can be read to suggest that it may be brought without first showing that a defendant's acts rendered other available remedies ineffective, it is not in line with the binding, subsequent authorities cited above. And in *Bell v. Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), and *Lynch v. Barrett*, 703 F.3d 1153 (10th Cir. 2013), the plaintiffs' underlying actions had already been completed and rendered ineffective, so their denial of access claims actually were ripe.

Here, as discussed above, John Burns, Tammy Burns, and Mr. Lawrence's underlying claims against Defendants for violating the Fourth and Fourteenth Amendments have not been dismissed and are still pending, and they "cannot merely guess that a . . . remedy will be ineffective because of a defendant's actions." *Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir. 1997). Thus, under the authority discussed above, John Burns, Tammy Burns, and Mr. Lawrence's claim for

UNITED STATES DISTRICT COURT
For the Northern District of California

1    denial of access is not ripe and must be dismissed without prejudice.[8]

2        **F.  Claim Six**

3        Claim Six is brought by all Plaintiffs against the City of Concord.  Plaintiffs bring this claim

4    under 42 U.S.C. § 1983 and *Monell*.  The City of Concord does not move to dismiss the claim

5    insofar as it is based on the underlying Fourth Amendment claims (Claims One, Two, and Three),

6    but it does move to dismiss the claim insofar as it is based on the alleged cover-up and investigation

7    of the shooting of Charles Burns.  The court agrees that this is appropriate.

8        Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official

9    policy or custom causes a constitutional tort.  *See Monell*, 436 U.S. at 690.  A municipality,

10   however, may not be held vicariously liable for the unconstitutional acts of its employees under the

11   theory of *respondeat superior.  See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997);

12   *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995).  To impose

13   municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: (1)

14   that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the

15   municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's

16   constitutional rights; and (4) that the policy is the moving force behind the constitutional violation.

17   *See Plumeau v. School Dist. # 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

18       Liability based on a municipal policy may be satisfied in one of three ways: (1) by alleging and

19   showing that a city or county employee committed the alleged constitutional violation under a

20   formal governmental policy or longstanding practice or custom that is the customary operating

21   procedure of the local government entity; (2) by establishing that the individual who committed the

22   constitutional tort was an official with final policymaking authority, and that the challenged action

23   itself was an act of official governmental policy which was the result of a deliberate choice made

24   from among various alternatives; or (3) by proving that an official with final policymaking authority

25   either delegated policymaking authority to a subordinate or ratified a subordinate's unconstitutional

26   ───────────────

27       [8] Because the court has determined that the denial of access claim is not ripe, the court does

28   not address Defendants' arguments that it also is insufficiently alleged.  That is a matter to be determined only if the claim ripens.

1   decision or action and the basis for it.  *See Fuller*, 47 F.3d at 1534; *Gillette v. Delmore*, 979 F.2d

2   1342, 1346-47 (9th Cir. 1992).

3      "In limited circumstances, a local government's decision not to train certain employees about

4   their legal duty to avoid violating citizens' rights may rise to the level of an official government

5   policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. ----, 131 S.Ct. 1350, 1359 (2011).

6   "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on

7   a failure to train." *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality

8   opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further

9   removed from the constitutional violation, than was the policy in *Monell* ")).  "To satisfy the statute,

10  a municipality's failure to train its employees in a relevant respect must amount to 'deliberate

11  indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.*

12  (quoting *City of Canton*, 489 U.S. at 388).  Only then "can such a shortcoming be properly thought

13  of as a city 'policy or custom' that is actionable under § 1983." *City of Canton*, 489 U.S. at 389; *see*

14  *Connick*, 131 S.Ct. at 1359-60.

15     "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor

16  disregarded a known or obvious consequence of his action." *Board of Comm'rs of Bryan County. v.*

17  *Brown*, 520 U.S. 397, 410 (1997).  "Thus, when city policymakers are on actual or constructive

18  notice that a particular omission in their training program causes city employees to violate citizens'

19  constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to

20  retain that program." *Connick*, 131 S.Ct. at 1360 (citing *Bryan Cty.*, 520 U.S. at 407).  "The city's

21  'policy of inaction' in light of notice that its program will cause constitutional violations 'is the

22  functional equivalent of a decision by the city itself to violate the Constitution.'" *Id.* (quoting *City*

23  *of Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)).  "A less

24  stringent standard of fault for a failure-to-train claim 'would result in *de facto respondeat superior*

25  liability on municipalities . . . .'" *Id.* (quoting *City of Canton*, 489 U.S. at 392); *see also Pembaur v.*

26  *Cincinnati*, 475 U.S. 469, 483 (1986) (opinion of Brennan, J.) ("[M]unicipal liability under § 1983

27  attaches where—and only where—a deliberate choice to follow a course of action is made from

28  among various alternatives by [the relevant] officials . . . .").  Thus, "[a] pattern of similar

constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 131 S.Ct. at 1360 (quoting *Bryan County*, 520 U.S. at 409). "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability.'" *Id.* (quoting *Bryan County*, 520 U.S. at 407 (internal quotation marks omitted)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

In this claim, Plaintiffs allege that the City of Concord did not adequately train its officers about "excessive force and false arrest" or "on issues of use of force, use of lethal force, arrest procedures, execution of warrants, and other related duties," like "conducting under cover investigations" and using "lethal force [against] person accused of felonies." (TAC ¶¶ 129, 132.) Allegations about this failure relate to a *Monell* claim based on the underlying Fourth Amendment claims arising out of Charles Burns's death and Mr. Lawrence's arrest. The City of Concord does not move to dismiss the *Monell* claim to the extent it is based on this.

Plaintiffs, however, also allege that the City of Concord uses the LEIFI Protocol "for the purpose of covering up police misconduct, including law enforcement[-]involved fatalities," and "to protect its officers from prosecution for their misconduct." (*Id.* ¶¶ 113-14; *see id.* ¶ 117.) The City of Concord moves to dismiss the *Monell* claim to the extent it is based on this. It points out that there can be no *Monell* violation when there is no underlying violation, and then it argues that Plaintiffs' cover-up-related allegations do not, at least at this time, support an underlying violation. The court agrees, to a point. As the court stated in its previous order, there is no federal right "to seek criminal justice" or to a certain kind of investigation or prosecution. *See Nelson v. Skehan*, 386 Fed. Appx. 783, 786 (10th Cir. 2010) ("Nelson has no constitutional right to have the Skehans and Trout prosecuted.") (citing *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1566–67 (10th Cir. 1993)); *Flores v. Satz*, 137 F.3d 1276, 1278 (11th Cir. 1998) ("That the prosecution did not investigate properly or prosecute expeditiously the charges against him does not violate clearly established constitutional

rights."). And as the court has determined in this order, Plaintiffs' denial of access claim is not ripe. Thus, Plaintiffs' allegations that the City of Concord used the LEIFI protocol to cover up their unlawful killing of Charles Burns cannot at this time support a stand-alone *Monell* claim. Plaintiffs' *Monell* claim against the City of Concord is dismissed without prejudice to the extent that it is based on the alleged cover-up and investigation of the shooting of Charles Burns. The allegations nonetheless are relevant to the excessive force and false arrest claims.

### G.  Claims Seven and Eight

Claim Seven is brought by all Plaintiffs against Contra Costa County, and Claim Eight is brought by all Plaintiffs against the City of Antioch. Plaintiffs bring these claims under 42 U.S.C. § 1983 and *Monell*. Contra Costa County and the City of Antioch move to dismiss the claims against them.

Like part of Plaintiffs' *Monell* claim against the City of Concord, Plaintiffs' *Monell* claims against Contra Costa County and the City of Antioch are based on the alleged cover-up and investigation of the shooting of Charles Burns. As already described, Plaintiffs allege that "[i]t was the policy and/or custom" of the Antioch Police Department to inadequately supervise and train its officers, and of the Contra Costa County District Attorney's Office to inadequately supervise and train its investigators, "regarding proper and lawful police misconduct investigations, and to instruct them to assist local law enforcement in concealing misconduct, thereby failing to adequately discourage further constitutional violations on the part of its investigators." (TAC ¶¶ 143, 159.) Specifically, the Antioch Police Department and the Contra Costa County District Attorney's Office "did not require appropriate in-service training or re-training of officers on the subject matter of lawful and proper police misconduct investigations" or "on issues of use of force, use of lethal force, arrest procedures, execution of warrants, and other related duties for which they would ordinarily be called upon to conduct investigations." (*Id.* ¶¶ 143, 147, 159, 161.) Plaintiffs allege that the Antioch Police Department and the Contra Costa County District Attorney's Office "had prior knowledge of the propensity of the Concord Police Department and Concord Police Officers to engage in unlawful acts in violation of persons['] constitutional rights, particularly with regard to excessive force," "and notwithstanding that knowledge agreed to participate in the investigation per the [LEIFI] Protocol for the purpose of covering up the constitutional violations of the officers."

1   (*Id.* ¶¶ 148, 162.)

2       For the reasons set forth in the previous section, Plaintiffs' *Monell* claims against Contra Costa

3   County and the City of Antioch are dismissed without prejudice to the extent that they are based on

4   the alleged cover-up and investigation of the shooting of Charles Burns.  The allegations nonetheless

5   are relevant to the excessive force and false arrest claims.

6       Furthermore, to the extent that Plaintiffs' *Monell* claims are based on Contra Costa County's or

7   the City of Antioch's "prior knowledge of the propensity of the Concord Police Department and

8   Concord Police Officers to engage in unlawful acts in violation of persons['] constitutional rights,

9   particularly with regard to excessive force," and Contra Costa County's or the City of Antioch's

10  deliberate indifference to that propensity, *see* TAC ¶¶ 148, 162, the claims fail.  As the court

11  explained in its previous order, Contra Costa County and the City of Antioch are not responsible for

12  training Concord police officers, and Plaintiffs have had numerous opportunities to re-allege these

13  claims.  Plaintiffs' *Monell* claims against Contra Costa County and the City of Antioch are dismissed

14  with prejudice to the extent that they are based on Contra Costa County's and the City of Antioch's

15  alleged failure to prevent the Concord police officers from violating the Fourth Amendment.

16  **H.  Claim Nine**

17      Claim Nine is brought by the Estate of Charles Burns against the "Concord Officer Defendants"

18  (defined as described when discussing Claim One) for battery.  The Concord Defendants do not

19  move to dismiss this claim.

20                                    **CONCLUSION**

21      Based on the foregoing, the court grants in part and denies in part Defendants' motions and

22  dismisses the Third Amended Complaint to extent described above.  Defendants shall answer the

23  Third Amended Complaint within 14 days from the date of this order.  *See* Fed. R. Civ. P.

24  12(a)(4)(A).

25  **IT IS SO ORDERED.**

26  Dated: April 9, 2015

27                                    _____
                                      LAUREL BEELER
                                      United States Magistrate Judge
28