UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JOHN BURNS, et al., | Case No. 14-cv-00535-LB |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| CITY OF CONCORD, et al., | |
| Defendants. | Re: ECF Nos. 224, 225 |

## INTRODUCTION

In May 2013, officers from the Concord Police Department ("CPD") attempted to execute a search warrant at the home of Charles Burns, whom the CPD suspected was selling methamphetamine. The police arrived at Mr. Burns's home and waited for him to emerge. Later that evening, Mr. Burns and another individual, Bobby Lawrence, who was visiting Mr. Burns, left the home to get into a truck that was parked outside. After the two men entered the truck, the police emerged and tried to detain them. Mr. Lawrence, who was driving, pulled away from the curb and sped away, with the police giving chase. The police ultimately blocked off roads to prevent the truck's escape. After the truck came to a stop, Mr. Burns got out and ran toward the middle of the intersection. Two officers, Detective Chris Loercher and Detective Francisco Ramirez, fired a total of eleven shots at Mr. Burns. A third officer, Officer Matthew Switzer — a canine handler who arrived on the scene after the initial volley of shots and saw Mr. Burns on the

ground — deployed a police dog, which bit Mr. Burns on his right arm and hands for about ten to fifteen seconds. Mr. Burns, who was ultimately hit with ten shots and suffered multiple puncture wounds from the dog bite, died at the scene. Following the shooting, the police arrested Mr. Lawrence.

Mr. Burns's estate, Mr. Burns's parents, and Mr. Lawrence bring this civil-rights lawsuit alleging the following claims:

1. Mr. Burns's estate brings (1) claims under 42 U.S.C. § 1983 for (a) unlawful seizure and (b) excessive force, in violation of his Fourth Amendment rights; (2) a claim under 42 U.S.C. § 1983 for deliberate indifference to the provision of emergency medical care, in violation of his Fourteenth Amendment rights; and (3) a state-law claim for battery.[1]

2. Mr. Burns's parents bring a claim under 42 U.S.C. § 1983 for deprivation of their right to familial association with Mr. Burns, in violation of their Fourteenth Amendment rights.

3. Mr. Lawrence brings claims under 42 U.S.C. § 1983 for (a) unlawful seizure and (b) excessive force, in violation of his Fourth Amendment rights.[2]

4. All plaintiffs bring claims against the City of Concord for municipal liability under the doctrine of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

Detectives Loercher and Ramirez — the two police officers who shot Mr. Burns — have not moved for summary judgment as to Mr. Burns's excessive-force or battery claims or Mr. Burns's parents' Fourteenth Amendment claims.[3] Those claims may proceed to trial. The remaining defendants have moved for summary judgment as to Mr. Burns's excessive-force and battery

---

[1] Mr. Burns's estate originally brought a conspiracy claim as well, but it has now dismissed that claim. Pls.' Opp'n to Mot. for Partial Summary J. ("Pls.' Opp'n") – ECF No. 230 at 26.

[2] Mr. Lawrence originally brought a claim for prolonged detention, but he has now dismissed that claim as well. *Id.* at 43.

[3] Mem. of Points and Authorities in Supp. of Defs.' Mot. for Partial Summary J. as to the Burns's Part of the Case ("Defs.' Burns Mem.") – ECF No. 225 at 8 n.2, 36–37, 38, 40.

claims, and all defendants have moved for summary judgment as to all other claims. For the reasons given below, the court denies (1) the motions for summary judgment of Detectives Chris Loercher, Francisco Ramirez, and Mike Hansen, Officers Matthew Switzer and Eduardo Montero, and Sergeant Steven White, as to Mr. Burns's claim under Section 1983 for excessive force for the dog bite, and (2) the motion for summary judgment of Officer Switzer as to Mr. Burns's claim for state-law battery for the dog bite. In all other respects, the defendants' motions for summary judgment are granted.

The following chart summarizes the disposition of the plaintiffs' claims (as they are numbered in the plaintiffs' Fourth Amended Complaint) and the defendants' motions for summary judgment:

| No. | Named Plaintiff | Claim | Disposition |
|-----|-----------------|-------|-------------|
| 1 | Estate of Charles Burns | Section 1983 for unlawful seizure (prior to the shooting) | Summary judgment granted as to all defendants |
| | | Section 1983 for excessive force (for the shooting) | 1. Loercher and Ramirez did not move for summary judgment<br>2. Summary judgment granted as to all other defendants |
| | | Section 1983 for excessive force (for the dog bite) | 1. Summary judgment denied as to Switzer, White, Loercher, Ramirez, Hansen, and Montero<br>2. Summary judgment granted as to all other defendants |
| | | Section 1983 for deliberate indifference to medical needs | Summary judgment granted as to all defendants |
| 2 | Estate of Charles Burns | Section 1983 for conspiracy to violate civil rights | Voluntarily dismissed, *see* ECF No. 230 at 30 |
| 3 | Bobby Lawrence | Section 1983 for unlawful seizure, illegal detention, and false imprisonment | Summary judgment granted as to all defendants |
| | | Section 1983 for excessive force | Summary judgment granted as to all defendants |
| | | Section 1983 for prolonged unjustified detention | Voluntarily dismissed, *see* ECF No. 230 at 43 |
| 4 | John and Tammy Burns | Section 1983 for deprivation of right to familial association | 1. Loercher and Ramirez did not move for summary judgment<br>2. Summary judgment granted as to all other defendants |

| No. | Named Plaintiff | Claim | Disposition |
|-----|-----------------|-------|-------------|
| 5 | 1. Estate of Charles Burns<br>2. John and Tammy Burns<br>3. Bobby Lawrence | Section 1983 against City of Concord for municipality liability under *Monell* (policies, training, ratification) | Summary judgment granted |
| 6 | Estate of Charles Burns | Battery (for the shooting) | 1. Loercher and Ramirez did not move for summary judgment<br>2. Summary judgment granted as to all other defendants |
|   |   | Battery (for the dog bite) | 1. Summary judgment denied as to Switzer<br>2. Summary judgment granted as to all other defendants |

## STATEMENT

### 1. The Initial Investigation

In January 2013, CPD Detective Mike Hansen became aware through a confidential informant of an individual named Charles Burns, whom the informant said was selling methamphetamine.[4] Over the next several months, Detective Hansen spoke with three additional informants, who similarly said that Mr. Burns was selling methamphetamine.[5] One of these informants also said that Mr. Burns always had a handgun concealed underneath his dashboard of his vehicle.[6] Detective Hansen, along with several other CPD officers, conducted surveillance of Mr. Burns and believed he was meeting with individuals in his car to conduct drug deals.[7] In May 2013, based on this information, Detective Hansen sought and obtained a warrant, signed by a California state superior court judge, to search Mr. Burns's residence, the surrounding grounds, and all vehicles under Mr. Burns's custody, care, or control, for methamphetamine and various other paraphernalia of or proceeds from methamphetamine dealing.[8]

---

[4] Hansen Aff. for Search Warrant – ECF No. 225-2 at 48.

[5] *Id.* at 48–50.

[6] *Id.* at 50.

[7] *Id.*; Hansen Dep. – ECF No. 225-2 at 63; Loercher Dep. – ECF No. 225-3 at 62.

[8] Search Warrant – ECF No. 225-2 at 54–56.

## 2. The Execution of the Search Warrant

That evening, after he obtained the warrant, Detective Hansen prepared an Operational Order and held briefings with CPD Special Investigations Bureau and Special Enforcement Unit officers to plan the execution of the warrant.[9] The Operational Order contained two scenarios: stopping Mr. Burns while he was driving on the street where the police believed he usually sold drugs, or stopping him outside his house as he walked towards his car.[10] In either scenario, the police planned to execute the warrant on him and conduct a search.[11] The Operational Order warned the officers participating in the Burns operation that Mr. Burns was likely armed with a handgun.[12] The Operational Order further instructed officers to keep their fingers off of their gun triggers until a threat presented itself.[13]

Following the briefings, the officers left to conduct surveillance on Mr. Burns.[14] When officers arrived at Mr. Burns's house that evening, they saw an unidentified truck (later determined to be Mr. Lawrence's truck) parked outside.[15] Later than evening, Mr. Burns and another individual (later determined to be Mr. Lawrence) left the house and walked toward the truck.[16] Mr. Lawrence got in the truck on the driver's side; Mr. Burns entered the truck on the passenger side, then got out of the truck and went back into the house, and then came out of the house and got into the truck again.[17]

After Mr. Burns was back in the truck, Detective Hansen directed the police to move in.[18] One CPD officer, Detective Daniel Smith, drove up behind the truck, got out of his vehicle, and,

[9] Hansen Dep. – ECF No. 225-2 at 75–77; Smith Dep. – ECF No. 225-3 at 19, 22–24; Loercher Dep. – ECF No. 225-3 at 67–68; Operational Order – ECF No. 225-5 at 2–31.

[10] Operational Order – ECF No. 225-5 at 4.

[11] *Id.*

[12] *Id.* at 3, 8

[13] *Id.* at 4.

[14] White Dep. – ECF No. 225-4 at 73–74.

[15] Smith Dep. – ECF No. 225-3 at 36.

[16] *Id.* at 39–41.

[17] *Id.* at 42–44.

[18] Price Dep. – ECF No. 225-5 at 42.

standing about 10 to 12 feet away from the truck, pointed his gun toward the truck and yelled, "Police, put your hands up."[19] The parties dispute whether or not Mr. Burns and Mr. Lawrence heard Detective Smith or knew at that point that he was a police officer: the defendants maintain that Mr. Burns and Mr. Lawrence knew it was the police, whereas the plaintiffs maintain that they believed that they were being threatened by an unknown assailant.[20] It is undisputed, however, that Mr. Burns and Mr. Lawrence did not submit to the police and instead pulled the truck away from the curb and sped away.[21]

The police pursued the truck and tried to stop it.[22] At one point, the truck drove up on the sidewalk to avoid police vehicles.[23] (Mr. Lawrence later acknowledged that his driving was "extremely dangerous" and that he could have hit someone on the sidewalk.[24]) At some point, the truck collided with at least one police vehicle. The parties dispute whether the truck hit the police or the police hit the truck,[25] but in any event, it is undisputed that this collision did not bring the truck to a stop.[26]

Following the collision, CPD Detective Chris Loercher and other police officers drove their

---

[19] Smith Dep. – ECF No. 225-3 at 48–53.

[20] *Compare, e.g.*, Lawrence Dep. – 233-1 at 227–28 (stating that Detective Smith did not appear to be a police officer or identify himself as a police officer) *with, e.g.*, Lawrence Second Police Interview – ECF No. 225-6 at 6–13 (initially stating that he did not know that Detective Smith was a police officer and then, under questioning, stating that he did know); *see also* Smith Dep. – ECF No. 225-3 at 54 (stating that he did not know if Mr. Lawrence heard that he was a police officer).

[21] Smith Dep. – ECF No. 225-3 at 53–54; Lawrence Dep. – ECF No. 225-5 at 98.

[22] Loercher Dep. – ECF No. 225-3 at 74–75.

[23] Lawrence Dep. – ECF No. 224-3, at 42–44; Video Clip – ECF No. 225-9 (on file with court) (showing truck driving up on sidewalk to get around vehicles); *accord* Lawrence First Police Interview – ECF No. 224-5 at 28; Loercher Dep. – ECF No. 225-3 at 76–77; Giacobazzi Dep. – ECF No. 225-4 at 39–40.

[24] Lawrence Dep. – ECF No. 224-3 at 43–44.

[25] *Compare* Loercher Dep. – ECF No. 225-3 at 76–77 (stating that the truck hit a police vehicle) *and* Giacobazzi Police Interview – ECF No. 233-1 at 212–13 (same) *with* Lawrence Dep. – ECF No. 233-2 at 87 (stating that his truck did not hit any other vehicles and that other vehicles hit his truck); *see also* Lawrence First Police Interview – ECF No. 224-5 at 31 ("DETECTIVE PARODI: Okay. Who initiated the contact? Was it you or this car? BOBBY LAWRENCE: Probably both of us.").

[26] *See* Loercher Dep. – ECF No. 225-3 at 78; *accord* Lawrence First Police Interview, ECF No. 224-4 at 32–34.

vehicles to block the truck's path, and Mr. Lawrence pulled over and brought the truck to a stop.[27]

### 3. The Shooting of Mr. Burns

After the truck stopped, Mr. Burns got out of the passenger side and began running toward the middle of the intersection.[28] Detective Loercher got out of his vehicle and told Mr. Burns to get on the ground and raise his hands.[29] The parties dispute what happened next, and the defendants concede that there is a factual dispute as to what Mr. Burns was doing, including whether he was running and had his hands in his waistband or whether he had come to a stop and had his hands in the air.[30] Detective Loercher testified that he saw Mr. Burns reach into his waistband area and that he saw a glint of metal at Mr. Burns's waistband.[31] Detective Loercher fired nine shots at Mr. Burns.[32] Detective Francisco Ramirez, who was also on the scene, testified that he heard the Detective Loercher's shots and believed that those sounds were Mr. Burns shooting at the police, and believed he saw a gun in Mr. Burns's waistband.[33] Detective Ramirez fired two shots at Mr. Burns.[34] Mr. Burns was hit with ten shots and fell to the ground.[35]

---

[27] Loercher Dep. – ECF No. 225-3 at 82–83; Lawrence Dep. – ECF No. 225-5 at 99.

[28] Smith Dep. – ECF No. 225-3 at 7; Lawrence Dep. – ECF No. 225-5 at 101.

[29] Loercher Dep. – ECF No. 225-3 at 83; Montero Dep. – ECF No. 225-3 at 130–31.

[30] Defs.' Burns Mem. – ECF No. 225 at 20–21.

[31] Loercher Dep. – ECF No. 225-3 at 89–91.

[32] *Id.* at 86–88, 93.

[33] Ramirez Dep. – ECF No. 225-5 at 79.

[34] *Id.* at 78–79.

[35] *Id.* at 84; Coroner's Report – ECF No. 225-9 at 55, 57–58. The plaintiffs claim that not all of the shots were fired in the initial volleys from Detectives Loercher and Ramirez, but rather that after the initial volleys, the police walked up to Mr. Burns while he was on the ground incapacitated and fired a final "kill shot." The plaintiffs did not cite admissible evidence in support of this theory in their Opposition. *See* Opp'n – ECF No. 230 at 24 (citing unsworn witness interview transcript); *Jones v. Williams*, 791 F.3d 1023, 1032 (9th Cir. 20150 ("References to such unsworn statements are insufficient to generate a genuine dispute of material fact."). After the defendants filed their Replies, the plaintiffs belatedly submitted an excerpt of a deposition transcript in support of their "kill shot" theory. *See* Pls.' Admin. Mot. to File Under Seal Pls.' Exs. A & B to Pls.' Decl. in Supp. of Reply to Defs.' Mot. to Strike, at ex. A – ECF No. 243-2 (filed under seal). The defendants have objected to the plaintiffs' submission of these exhibits. *See* Defs.' Objs. to Pls.' Improper Surreply Briefs to Defs.' Timely Reply Brief – ECF No. 246. As a dispute as to whether there was a final "kill shot" does not affect the outcome of the any of the pending motions for summary judgment, the court declines to address these objections here.

Mr. Burns was, in fact, not armed — he had only a cell phone.[36] (When the police searched Mr. Burns's house the next day, however, they found a loaded 9mm handgun in his bedroom.[37])

### 4. The Canine Deployment on Mr. Burns

CPD Officer Matthew Switzer, a canine handler, was driving toward the scene when he heard shots being fired.[38] Officer Switzer stopped his car and ran toward the scene.[39] When he arrived, he saw Mr. Burns lying on the road.[40] Officer Switzer yelled, "Do you need the dog? Do you need the dog?"[41] Another CPD officer, Sergeant Steven White, responded, "Yes."[42] Officer Switzer additionally testified that he saw Mr. Burns lift his head up and believed that Mr. Burns was about to sit up and decided on his own to deploy his dog.[43] Officer Switzer testified that he has independent authority to deploy his dog and does not need authorization from a supervisor.[44] He testified that he is the only person who can make the decision to deploy his dog and that a supervisor cannot order him to deploy his dog.[45]

Officer Switzer commanded his dog to bite and hold Mr. Burns.[46] The dog bit Mr. Burns on the right arm or shoulder and held on for about ten to fifteen seconds.[47] After about ten to fifteen seconds, Officer Switzer ordered the dog to release him.[48] The dog inflicted multiple puncture

[36] *See* Law Enforcement Investigative Fatal Incident Protocol Report – ECF No. 233-1 at 389; *accord* Ramirez Dep. – ECF No. 225-5 at 89; Montero Dep. – ECF No. 225-3 at 132.

[37] Makayama Decl. – ECF No. 225-8 at 4.

[38] Switzer Dep. – ECF No. 225-6 at 62.

[39] *Id.* at 64–65.

[40] *Id.* at 64; Switzer Dep. – ECF No. 233-2 at 63.

[41] Switzer Dep. – ECF No. 225-6 at 65.

[42] *Id.*

[43] *Id.* at 69–70; Switzer Dep. – ECF No. 233-2 at 99.

[44] Switzer Dep. – ECF No. 233-2 at 60.

[45] *Id.* at 61.

[46] Switzer Dep. – ECF No. 225-6 at 67–68.

[47] *Id.* at 71, 73

[48] *Id.* at 73.

wounds on Mr. Burns's arm and shoulder, "rang[ing] in diameter from 1 mm – 5 mm and rang[ing] in depth from superficial (just bruising the skin) to deep (penetrating skin, subcutaneous tissue and muscle)."[49]

It is not entirely clear from the record where the other officers were when Officer Switzer deployed the dog on Mr. Burns. There is evidence that no other officers were near Mr. Burns when the dog was deployed.[50] There is also evidence, however, that Detectives Loercher, Ramirez, and Hansen, and CPD Officer Eduardo Montero, might have approached Mr. Burns and might have been standing next to him when the dog was deployed, or after the dog was deployed but before Officer Switzer had the dog release him.[51] There is evidence that these officers had their weapons drawn and pointed at Mr. Burns at the time.[52]

## 5. The Determination of Death of Mr. Burns

Following the shooting, Officer Montero approached Mr. Burns to check for vital signs, but

---

[49] Coroner's Report – ECF No. 225-9 at 56.

[50] *See, e.g.*, Montero Dep. – ECF No. 233-8 at 39 ("Q. Was anyone near him[,] Mr. Burns[,] when the dog bit him? A. No.").

[51] *See* Ramirez Dep. – ECF No. 225-5 at 84–87 ("Q. Okay. All right. What's the next thing you remember after [the shooting]? A. I approached the body, along with other officers. And at one point the K-9 came up and bit Charles Burns. I don't know where. Q. Where were you? A. I was probably at the feet of Charles Burns with the other officers. . . . Q. Okay. You said you went up to Burns' body. Do you remember if Loercher was there? A. Yes, he was. Q. Was Hansen? A. Yes, he was. Q. Okay. Anybody else? A. I believe it was Det. Montero. Q. Anybody else? A. K-9 Officer Switzer and his K-9. Q. Anybody else? A. Immediately after the shooting, that's about who I remember there, until things settled down."); Switzer Dep. – ECF No. 233-1 at 381 ("Q. Okay. When you went up and grabbed the dog off of Burns do you remember if there were other officers nearby, right there close by to you? A. There were, yes. Q. Do you remember who? A. No. Q. How many officers? A. At least two."); *see also* Bell Dep. – ECF No. 233-2 at 15–16 ("After the shots were fired, a police dog was released. And from my perspective, it was on the other side of where Charles Burns was. I didn't see how it got released or where -- all of a sudden, I saw a police dog running, and it ran toward a group of Concord officers. And as I watched it, I thought it was going to bite one of the officers. And then it looked like one of the officers kind of grabbed the dog and detoured it towards Charles Burns, and then that's when it bit Mr. Burns. And I didn't understand how the dog didn't end up biting Concord police. I just thought it was that they were lucky that they didn't get bitten, and I didn't know that you could do that with a police dog and just divert it."); White Dep. – ECF No. 233-2 at 73–74 ("Q. And you -- in [your police investigation] statement it said something to the effect it was Hansen and I think Loercher and another person that were about a few feet away from [Mr. Burns'] body. Do you remember that? A. Yeah. Q. Does that sound right to you? A. That sounds from the statement, yes. Q. Okay. Does that sound correct relative to your recollection of the events? A. Yes.").

[52] *See* Montero Dep. – ECF No. 233-2 at 34, 40.

did not do so since it appeared to him that Mr. Burns was already deceased.[53] CPD Officer Paul

Miovas, who was also in the vicinity and who had received medical training in the Army, also

approached Mr. Burns to check on him, and it appeared to Officer Miovas that Mr. Burns was

already deceased.[54] Detective Loercher checked Mr. Burns's pulse and stated that he had none.[55]

Detective Hansen called for a medical bag, and another officer brought one up to him, but it

appeared to Detective Hansen that Mr. Burns was already deceased.[56] Medical personnel were

called to the scene and made the determination that Mr. Burns was deceased.[57]

### 6. The Seizure of Mr. Lawrence

After the shooting, Detective Smith and another CPD officer, Sergeant Steven Price,

approached Mr. Lawrence's truck, where Mr. Lawrence was still sitting.[58] Detective Smith and

Sergeant Price physically pulled Mr. Lawrence out of the truck, put him on the ground, and

handcuffed him.[59] Mr. Lawrence testified that one of the officers threatened to beat him but does

not claim that any officer actually hit him or that he suffered any physical injuries.[60]

### SUMMARY-JUDGMENT STANDARD

The court must grant a motion for summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material

facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about

---

[53] Montero Dep. – ECF No. 225-3 at 108.

[54] Miovas Dep. – ECF No. 225-6 at 79–81.

[55] Cain Dep. – ECF No. 225-6 at 86.

[56] Hansen Dep. – ECF No. 225-2 at 80.

[57] Rafferty Dep. – ECF No. 225-7 at 3–7.

[58] Smith Dep. – ECF No. 224-2 at 48; Price Dep. – ECF No. 224-3 at 76.

[59] Smith Dep. – ECF No. 224-2 at 48–49; Price Dep. – ECF No. 224-3 at 76–77; *accord* Lawrence Dep. – ECF No. 224-3 at 50–52.

[60] Lawrence Dep. – ECF No. 224-3 at 50–54.

United States District Court
Northern District of California

a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence, and it draws all inferences in the light most favorable to the non-moving party. *E.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

# ANALYSIS

## 1. Mr. Burns's Section 1983 Claim for Unlawful Seizure Prior to the Shooting

Mr. Burns first brings a claim under 42 U.S.C. § 1983 alleging that he was unlawfully seized

by the police prior to the shooting. But Mr. Burns was not in fact seized by the police prior to the shooting, and therefore he cannot maintain an unlawful-seizure claim for those events. Additionally, the officer defendants have qualified immunity. As such, summary judgment for all officers on this claim is appropriate.

### 1.1 Governing Law

#### 1.1.1 42 U.S.C. § 1983 and Fourth Amendment Unlawful Seizure

Section 1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States" by any person acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635, 639 (1980). Section 1983 is not itself a source for substantive rights, but rather a method for vindicating federal rights conferred elsewhere. *See Graham v. Connor*, 490 U.S. 386, 393–94 (1989). To state a claim under Section 1983, a plaintiff must allege: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct violated a right secured by the Constitution or laws of the United States. *See West v. Atkins*, 487 U.S. 42, 48 (1988). It is undisputed that all defendants here were acting under color of state law. The issue here is whether Mr. Burns was seized in violation of his constitutional rights, specifically his rights under the Fourth Amendment.

The general rule is that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) (quoting *United States v. Medenhall*, 446 U.S. 544, 554 (1980)). But "[t]his determination is 'a *necessary*, but not a *sufficient*, condition for seizure. In addition, some form of 'touching or submission' is also required." *Id.* (emphasis in original) (quoting *California v. Hodari D.*, 499 U.S. 621, 626–28 (1991)). "Regardless of how unreasonable the officers' actions were, and regardless of how reasonable it was for [the individual] to feel restrained," if an individual was not physically touched by the police and did not actually submit to their authority, there was no seizure, and the Fourth Amendment is not implicated. *Id.* at 1217 (citing *Hodari D.*, 499 U.S. at 626). If, for example, the police approach an individual, point their guns at him, and

tell him that he is under arrest, but the individual does not actually submit to the police, no seizure has occurred, and the individual cannot later raise a Fourth Amendment claim. *Id.* at 1215–17 (when an individual "was ordered at gunpoint to stop and put up his hands" but instead "turned and walked away, not raising his hands," there was no seizure). This doctrine thereby "creates incentives for future defendants to submit to asserted police authority, thereby avoiding an escalation of conflict that could have lethal consequences." *Id.* at 1217 (citations omitted).

Additionally, a seizure occurs only when the police terminate an individual's freedom of movement through means intentionally applied. *United States v. Al Nasser*, 555 F.3d 722, 728 (9th Cir. 2009) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1988)). In the absence of submission, if the police use physical force to try to seize an individual but do not actually terminate his freedom of movement, no seizure has occurred. *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994) ("A seizure does not occur if an officer applies physical force in an attempt to detain a suspect but such force is ineffective.") (citing *Hodari D.*, 499 U.S. at 625); *accord Al Nasser*, 555 F.3d at 729 ("the car or individual's freedom of movement [must] end" to constitute a seizure) (citations omitted).

If a court determines a seizure has occurred, it must then determine whether the seizure was lawful and complied with the Fourth Amendment. "The 'touchstone of the Fourth Amendment is reasonableness.'" *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). The police may, consistent with the Fourth Amendment, conduct brief investigatory stops of persons or vehicles that fall short of a traditional arrest if supported by reasonable suspicion. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1020 (9th Cir. 2009) (citations omitted). If the police have a warrant founded on probable cause to search a residence for contraband, the police implicitly have a limited authority to detain its occupants while a proper search is conducted. *Davis v. United States*, 854 F.3d 594, 599 (9th Cir. 2017) (citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981)). Additionally, if the police have probable cause to believe that a vehicle has committed a traffic violation, they may stop the vehicle, *Whren v. United States*, 517 U.S. 806, 810 (1996), and, incident to that stop, may detain its occupants, *United States v. Williams*, 419 F.3d 1029, 1032–33 (9th Cir. 2005).

### 1.1.2   Qualified Immunity

"[T]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (internal quotation marks omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "The purpose of qualified immunity is to strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Id.* (quoting *Pearson*, 555 U.S. at 231). "The doctrine of qualified immunity assumes that police officers do not knowingly violate the law." *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994). "An officer thus is presumed to be immune from any damages caused by his constitutional violation." *Id.*

Qualified immunity "is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (emphasis in original) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Qualified immunity protects an officer from suit "when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'" *Id.* at 1866 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Id.* at 1867.

In determining whether an officer is entitled to qualified immunity, courts consider (1) whether the officer violated a constitutional right of the plaintiff, and (2) whether that constitutional right was "clearly established in light of the specific content of the case" at the time of the events in question. *Mattos*, 661 F.3d at 440 (citation omitted). Courts may exercise their sound discretion in

deciding which of these two prongs should be addressed first. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Regarding the second prong, the Supreme Court has cautioned that "'clearly established law' should not be defined 'at a high level of generality'" but instead "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted). "Except in the rare case of an 'obvious' instance of constitutional misconduct . . ., [p]lainitffs must '*identify a case* where an officer acting under similar circumstances as defendants was held to have violated the Fourth Amendment'" in order to overcome qualified immunity. *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (emphasis in original, internal brackets omitted) (citing *White*, 137 S. Ct. at 552). "[T]he prior precedent must be 'controlling' — from the Ninth Circuit or the Supreme Court — or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

### 1.2 Analysis

Here, it is undisputed that when Detective Smith first tried to detain Mr. Burns at his residence, he and Mr. Lawrence did not submit to the police and instead sped off in their truck. Regardless of whether Detective Smith acted appropriately in approaching and pointing his gun at them, and regardless of whether Mr. Burns knew that Detective Smith was a police officer, it is undisputed that Mr. Burns was not physically subdued and did not submit to the police at this point, and hence no seizure occurred. Likewise, it is undisputed that the police did not terminate Mr. Burns's freedom of movement during the car chase. Regardless of whether the police acted appropriately in giving chase, and regardless of whether Mr. Lawrence's truck rammed into police vehicles or police vehicles rammed into the truck, it is undisputed that these collisions did not actually stop the truck's movement and Mr. Burns did not submit to the police, and hence no seizure occurred then either. Before the point at which Mr. Lawrence pulled over and stopped the truck and Mr. Burns ran out into the intersection — where he was shot by Detectives Loercher and Ramirez — Mr. Burns was not seized, and therefore cannot sustain a claim for unlawful seizure prior to the shooting.

Additionally, even if the officers seized Mr. Burns unlawfully before the shooting, the officers

United States District Court
Northern District of California

1  are entitled to qualified immunity. Reasonable police officers in the defendants' position would

2  not necessarily have known for certain that a seizure was unlawful. The officers could reasonably

3  believe that they had the authority to lawfully seize Mr. Burns, either as an occupant of his house

4  to be detained pursuant to a search warrant issued for that house, or as an occupant of a vehicle

5  that they believed had conducted multiple traffic violations. The plaintiffs have cited no

6  controlling cases clearly establishing that the officers' actions violated Mr. Burns's constitutional

7  rights prior to the shooting, and hence the officers are entitled to qualified immunity.

8

9  **2. Mr. Burns's Section 1983 Claim for Excessive Force Regarding the Shooting**

10     Detectives Loercher and Ramirez — the two officers who shot Mr. Burns — have not moved

11  for summary judgment with respect to Mr. Burns's excessive-force claim. The other defendants,

12  however — none of whom fired a shot — have moved for summary judgment. Mr. Burns argues

13  that they should nonetheless be held liable for his excessive-force claim for the shooting as

14  "integral participants" in the shooting and for failing to intercede in the shooting, and —

15  specifically as to Detective Hansen and Sergeant White — should be held liable as supervisors.

16  The evidence in the record, however, does not support that the non-shooting officers were integral

17  participants in the shooting or that they had a realistic opportunity to intercede and failed to do so,

18  nor does it support a claim of supervisory liability against Detective Hansen or Sergeant White.

19  Consequently, all defendants other that Detectives Loercher and Ramirez are entitled to summary

20  judgment with respect to Mr. Burns's excessive-force claim for the shooting.

21     **2.1 Excessive Force in General**

22        **2.1.1 Governing Law**

23      "Determining whether the force used to effect a particular seizure is reasonable under the

24  Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the

25  individual's Fourth Amendment interests against the countervailing governmental interests at

26  stake." *Graham*, 490 U.S. at 396 (citations and internal quotation marks omitted). To do so, a

27  court must evaluate "the facts and circumstances of each particular case, including [(1)] the

28  severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of

the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations omitted). The *Graham* factors, however, are not exhaustive. *George v. Morris*, 736 F.3d 829, 837–38 (9th Cir 2013). Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos*, 661 F.3d at 441, courts must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. McPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citations omitted).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)); *see id.* at 396 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment.") (citations omitted). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

It is also important to remember that the court's review of the evidence is influenced by the fact that the other principal witness to these events — Mr. Burns — is dead. Of such cases the Ninth Circuit has said: "We are mindful that cases in which the victim of alleged excessive force has died 'pose a particularly difficult problem' in assessing whether the police acted reasonably, because 'the witness most likely to contradict [the officers'] story . . . is unable to testify.'" *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994)). "Accordingly, [the court] must 'carefully examine all the evidence in the record' to determine if the officers' account of the events is credible." *Id.* (quoting *Scott*, 39 F.3d at 915). "Following such reasoning, [the Ninth Circuit] ha[s] denied summary judgment to defendant police officers in cases where 'a jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force.'" *Id.* (quoting *Santos v. Gates,* 287 F.3d 846, 852 (9th Cir. 2002)).

In analyzing excessive-force claims, courts must look solely at whether the use of force itself was reasonable. As the Supreme Court has recently clarified, an excessive-force claim cannot be based on a "provocation" theory that police officers committed other Fourth Amendment violations prior to the use of force that escalated the situation and thereby provoked a violent confrontation that resulted in the use of force. *Cnty. of L.A. v. Mendez*, 137 S. Ct. 1539 (2017). In that case, police officers entered a shack without a warrant and without announcing their presence, saw two individuals inside — one of whom was holding a BB gun — and fired fifteen shots at them, severely wounding them. *Id.* at 1544–45. Among other Fourth Amendment claims, the plaintiffs brought a claim for excessive force against the police for the shooting. *Id.* at 1545. The trial court and the Ninth Circuit held that the shooting itself was a reasonable response given the police's belief that one of the individuals had a gun and was threatening them, but held that the police had "provoked" the situation by entering the shack without a warrant and hence could be held liable for an excessive-force claim for the resultant shooting. *See id.* at 1545–46. The Supreme Court reversed and held that the officers could not be held liable for excessive force. *Id.* at 1547. Setting aside whether the police might be separately liable for a Fourth Amendment claim for the warrantless entry, the Supreme Court rejected the "provocation" doctrine and held that those prior acts could not give rise to a claim for excessive-force claim under a theory that those earlier violations "provoked" the shooting, holding that each alleged Fourth Amendment violation must be analyzed separately. *Id.*

"In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (citations omitted).

### 2.1.2 Analysis

In order for the non-shooting officers to be liable, they must have personally participated in the alleged rights deprivation. As it is undisputed that no other officer personally fired a shot, the court therefore examines whether the non-shooting officers can be held liable as integral participants to the shooting or for failing to intercede in the shooting, or — with respect to

Detective Hansen and Sergeant White — can be held liable as supervisors.

## 2.2 Integral Participation

### 2.2.1 Governing Law

"An officer's liability under 42 U.S.C. § 1983 is predicated on his 'integral participation' in the alleged [constitutional] violation." *Blankenhorn v. City of Orange,* 485 F.3d 463, 481 n.12 (9th Cir. 2007) (citing *Chuman v. Wright,* 76 F.3d 292, 294–95 (9th Cir. 1996)). The "integral participant" rule "extends liability to those actors who were integral participants in the constitutional violation, even if they did not directly engage in the unconstitutional conduct themselves." *Hopkins v. Bonvicino,* 573 F.3d 752, 770 (9th Cir. 2009). Integral participation "does not require that each officer's actions themselves rise to the level of a constitutional violation." *Blankenhorn,* 485 F.3d at 481 n.12 (quoting *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004)). "But it does require some fundamental involvement in the conduct that allegedly caused the violation." *Id.* (citing *Boyd,* 374 F.3d at 780). Liability cannot be premised on a theory that the constitutional violation was the result of a "team effort" — each individual officer can only be held liable based on his or her own individual conduct. *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996).

### 2.2.2 Analysis

Mr. Burns has offered no evidence that any of the non-shooting officers were integral participants in the shooting. Instead, he argues that the other officers were integral participants in escalating and provoking the situation that led up to the shooting through their "poor planning and poor execution" of the search warrant and the Burns operation as a whole.[61] Among other things, he argues that the police failed to properly identify themselves as police officers, which resulted in his and Mr. Lawrence's belief that they were being targeted by unknown assailants, which in turn resulted in their fleeing in their truck and beginning a car chase.[62] He then argues that the police

---

[61] *See* Opp'n – ECF 230 at 19 ("The poor planning and poor execution by the officers is what created the chaotic scene. The operation was not only poorly planned, [it] was modified on the fly without any consideration for safety."); *see generally id.* at 19–22.

[62] *Id.* at 21.

rammed Mr. Lawrence's truck with their vehicles, further escalating the situation.[63] But Mr. Burns's version of events, even if credited, does not establish that any non-shooting officer was an integral participant in the shooting. As the Supreme Court has instructed in *Mendez*, Mr. Burns's excessive-force claim for the use of force in the shooting must be analyzed separately from his complaints about the police's actions prior to that use of force. *See Mendez*, 137 S. Ct. at 1537. Liability for the non-shooting officers cannot be based on a theory that they escalated and provoked the situation that resulted in the shooting. *See id.* As Mr. Burns argues only that the non-shooting officers escalated and provoked the situation leading up to the shooting but offers no evidence that they were integral participants in the shooting itself, Mr. Burns cannot maintain an excessive-force claim for the shooting against the non-shooting officers.

### 2.3 Failure to Intercede

#### 2.3.1 Governing Law

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996). "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000); *see also id.* at 1290 (opportunity to intercede must be a "realistic opportunity"). In a police shooting case, summary judgment in favor of non-shooting officers may be appropriate if they were present during the shooting but did not know that the shooting officers were going to shoot and were not physically capable of preventing the shooting. *See Ting*, 927 F.2d at 1511–12; *accord Cunningham*, 229 F.3d at 1290.[64]

#### 2.3.2 Analysis

Mr. Burns has offered no evidence that any of the non-shooting officers had a realistic opportunity to intercede in the shooting. There is no evidence in the record that any of them knew

---

[63] *Id.* at 21–22.

[64] *Cf. Caylor v. City of Seattle*, No. C11-1217RAJ, 2013 WL 1855739, at *15 (W.D. Wash. Apr. 30, 2013) (cited by Opp'n – ECF No. 230 at 28) (denying summary judgment to non-shooting officer who was told in advance by shooting officer that he planned to shoot and who "did nothing but tell [him] not to miss").

that Detectives Loercher or Ramirez were going to shoot Mr. Burns. Nor is there evidence that they were physically capable of preventing the shooting. *Cf. Ting*, 927 F.2d at 1511–12 (affirming summary judgment and holding that even when all parties were in a single bedroom, four non-shooting officers were "physically incapable" of preventing fifth officer from shooting suspect, given that non-shooting officers were positioned "around the room").[65] Additionally, the non-shooting officers are entitled to qualified immunity. Mr. Burns cites to no controlling cases that clearly establish in the situation at hand — where the police were pursuing a suspect whom they believed might be armed in a rapidly evolving situation — that the non-shooting officers had a duty to intercede Detectives Loercher or Ramirez and prevent them from shooting. *Cf. Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.").

## 2.4 Supervisory Liability

### 2.4.1 Governing Law

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989)). "Supervisors can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Cunningham*, 229 F.3d at 1292 (citing *Larez v. City of L.A.*, 946 F.2d 630, 646 (9th Cir. 1991)). In other words, a supervisor can be held liable in his individual capacity "if he set

---

[65] Mr. Burns's "kill shot" theory does not change this conclusion. Even crediting that theory, there is no evidence in the record that any other officer besides Detectives Loercher or Ramirez were involved in any such shot or knew that anyone was going to fire such a shot, much less that any other officer had a realistic opportunity to intercede.

in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez v. City of L.A.*, 946 F.2d 630, 646 (9th Cir. 1991) (citations and internal quotation marks and brackets omitted).

### 2.4.2 Analysis

Mr. Burns has offered no evidence that Detective Hansen or Sergeant White knew or reasonably should have known that their actions or inactions would result in the constitutional injury of which he complains, i.e., the shooting. As to Detective Hansen, Mr. Burns argues that he "clearly set the wheels in motion in this case with his ad hoc plan [for the Burns operation] and modification with total disregard to the safety risks created by that action, not to mention to [sic] direct violation of departmental understanding."[66] But that does not mean Detective Hansen knew or should have known that his ostensibly careless or bungled plan would result in anyone's shooting Mr. Burns, particularly given that his Operational Order instructed officers to keep their fingers off of their gun triggers until a threat presented itself. *Cf. Estate of Lopez ex rel. Lopez v. Torres*, No. 15-cv-0111-GPC-MDD, 2016 WL 429910, at *8 (S.D. Cal. Feb. 4, 2016) (holding that police supervisor that provided to SWAT team erroneous information about dangerousness of suspect that he allegedly should have known "would cause heightened tension, awareness, and fear, and would give rise to a likelihood of the immediate use of deadly force," was not liable, because it was not reasonable to infer that supervisor knew or should have known that an officer "would use more force than necessary under the circumstances" and shoot the plaintiff). As to Sergeant White, Mr. Burns offers no evidence and makes no real argument about his supervisory actions or inactions in connection with the shooting at all.[67]

                              *        *        *

For the foregoing reasons, summary judgment in favor of all of the non-shooting officer defendants as to Mr. Burns's claim for excessive force for the shooting is granted.

---

[66] *See* Opp'n – ECF No. 230 at 26; *see also id.* at 20, 25.

[67] *See* Opp'n – ECF No. 230 at 17, 25.

### 3. Mr. Burns's Section 1983 Claim for Excessive Force Regarding the Canine Deployment

All defendants have moved for summary judgment with respect to Mr. Burns's claim for excessive force regarding the deployment of a police dog against him. It is undisputed that by the time the dog was deployed, Mr. Burns had already been shot and was lying on the ground. There are questions of material fact as to whether Officer Switzer — the canine handler — acted reasonably in deploying the dog and whether he is entitled to qualified immunity. Additionally, there are questions of material fact as to whether Detectives Loercher, Ramirez, Hansen, and Montero had an opportunity to intercede in the dog attack and failed to do so. Finally, there are questions of material fact as to whether Sergeant White is subject to supervisory liability. Summary judgment as to these defendants for Mr. Burns's excessive-force claim for the dog deployment is therefore denied.

#### 3.1 Governing Law

As the Ninth Circuit recently reconfirmed, "continued force against a suspect who has been brought to the ground can violate the Fourth Amendment." *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (citing *Drummond v. City of Anaheim*, 343 F.3d 1052, 1057–58 (9th Cir. 2003); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053 (9th Cir. 2007)). In *Zion*, a police officer fired a nine-round volley from about fifteen feet away at a suspect, who was wounded and dropped to the ground. *Id.* at 1075. The officer than ran up to where the suspect had fallen and, from about four feet away, fired nine more rounds at the suspect, and then stomped on his head three times. *Id.* The Ninth Circuit held that it was "clearly established" that this continued use of force on a suspect who was wounded, brought to the ground, and no longer posed a threat, violated the Fourth Amendment. *Id.* at 1076 (citing *Drummond*, 343 F.3d at 1057–58; *Davis*, 478 F.3d at 1053).

Excessive force is not limited to police shootings. The use of a police dog is certainly subject to Fourth Amendment excessive-force analysis. *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) ("'We . . . hold that the . . . use of the police dog is subject to excessive force analysis . . . .'") (quoting *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)). "Use of a trained police dog may be regarded as 'intermediate force' or 'deadly force,' depending on the factual

circumstances in the case." *Ledesma v. Kern Cnty.*, No. 1:14-cv-01634-DAD-JLT, 2016 WL

6666900, at *10 (E.D. Cal. Nov. 10, 2016); *see Maney v. Garrison*, 681 F. App'x 210, 220 (4th

Cir. 2017) ("[A] bite from a police canine is a significant use of force."). The use may or may not

be constitutional. *See Watkins*, 145 F.3d at 1092–93 (discussing *Chew v. Gates*, 27 F.3d 1432 (9th

Cir. 1994)).

### 3.2 Analysis

#### 3.2.1 Officer Switzer

The record indicates there are disputes of material fact as to the *Graham* factors as to whether

Officer Switzer's deployment of his dog on Mr. Burns was reasonable. Among other things, there

appear to be disputes about whether or not Mr. Burns posed an immediate threat to the safety of

the officers and whether or not Mr. Burns was still actively resisting arrest. There is evidence in

the record that suggests that when Officer Switzer deployed his dog, Mr. Burns had not yet been

apprehended and moved in a way that suggested he might be reaching for a weapon and still posed

a threat to the officers' safety. But there is also evidence that suggests that, to the contrary, Mr.

Burns was not resisting and posed little if any threat to the safety of the officers, and that multiple

officers felt comfortable in approaching Mr. Burns and standing next to him.  The court is also

mindful of the fact that Mr. Burns is unable to testify as to his version of the events, and therefore

"must 'carefully examine all the evidence in the record' to determine if the officers' account of the

events is credible." *Gregory*, 523 F.3d at 1107 (quoting *Scott*, 39 F.3d at 915); *see also Zion*, 874

F.3d at 1076 (a court "may not simply accept what may be a self-serving account by the police

officer" in determining whether suspect still posed a threat) (quoting *Scott*, 39 F.3d at 915). A jury

could reasonably find that when Officer Switzer deployed his dog, Mr. Burns had already been

shot multiple times, was incapacitated and dying on the street, and no longer posed a threat. A jury

could further reasonably find that despite having already approached and surrounded Mr. Burns

with their guns drawn on him, the police nonetheless deployed a dog on him that attacked him for

ten to fifteen seconds. Drawing all factual inferences in Mr. Burns's favor, the court cannot say as

a matter of law that Officer Switzer's deployment of his dog and the force the dog applied to Mr.

Burns was reasonable.

Nor can the court say as a matter of law that Officer Switzer is entitled to qualified immunity. As the Ninth Circuit recently confirmed in *Zion*, it has long been clearly established law that the police cannot use continued force against a suspect who no longer poses a threat, such as in a situation (presented in that case and in this one) where the suspect has already been shot multiple times and may be wholly incapacitated on the ground. *Zion*, 874 F.3d at 1076 (citing *Drummond*, 343 F.3d at 1057–58; *Davis*, 478 F.3d at 1053); *see also Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994) (holding that it is clearly established law that the police may not deploy a dog on an individual who has been handcuffed and is under police control).[68] Drawing all factual inferences in Mr. Burns's favor, a reasonable jury could find that Officer Switzer deployed a dog on an incapacitated, dying individual who posed no threat to officers and, in doing so, violated clearly established law.

Officer Switzer also advanced an alternate argument, namely, that he is entitled to qualified immunity because Sergeant White authorized him to deploy his dog.[69] This is unavailing. Even assuming reliance on a supervisor entitles an officer to qualified immunity — a proposition for which Officer Switzer cites no authority — Officer Switzer's testimony established that a supervisor cannot order him to deploy his dog and that he independently made the decision to do so.

For the foregoing reasons, Officer Switzer's motion for summary judgment as to Mr. Burns's excessive-force claim for the use of his dog is denied.

### 3.2.2  Sergeant White

The record indicates that Sergeant White approved Officer Switzer's deployment of his dog. The fact that Officer Switzer cannot rely on Sergeant White to claim automatic qualified immunity does not conversely mean that Sergeant White is shielded from his own potential liability as a

---

[68] Notably, *Zion* did not establish a new rule. If it had, there might be a question as to whether a rule announced in 2017 was clearly established at the time of Mr. Burns's shooting in 2013. But the Ninth Circuit was clear that its decision in *Zion* was only reapplying law that had been clearly established long before the shooting here. *See Zion*, 874 F.3d at 1076 (citing *Drummond* and *Davis*, two cases that well predated 2013).

[69] Defs.' Burns Mot. – ECF No. 225 at 39.

supervisor. By authorizing Officer Switzer to deploy his dog, Sergeant White acquiesced in the alleged constitutional deprivation of which Mr. Burns complains — the excessive force from the dog bite — and arguably showed a reckless or callous indifference to Mr. Burns's rights. Sergeant White therefore potentially has supervisory liability with respect to this claim. Additionally, for the same reasons as described above for Officer Switzer, Sergeant White is not entitled to qualified immunity as a matter of law. Sergeant White's motion for summary judgment as to Mr. Burns's excessive-force claim for the use of the police dog is therefore denied.

### 3.2.3 The Other Officers

While the record is not entirely clear, there is evidence that Detectives Loercher, Ramirez, and Hansen, and CPD Officer Montero, may have been standing next to Mr. Burns when Officer Switzer's dog attacked him. The court cannot say as a matter of law that these officers had no realistic opportunity to intercede and prevent or limit the dog's attack. *Cf. Kyles v. Baker*, 72 F. Supp. 3d 1021, 1040 (N.D. Cal. 2014) (denying summary judgment to non-canine-handler officer in case where dog bit suspect for thirty seconds, because officer was "in close proximity . . . to where [dog] was biting [plaintiff]'s leg" and, "[v]iewing the facts in the light most favorable to [plaintiff], it is reasonable to infer that this amount of time, combined with [officer]'s proximity to the alleged misconduct, provided [officer] with a realistic opportunity to intercede"). Additionally, for the same reasons as described above for Officer Switzer, these officers are not entitled to qualified immunity as a matter of law.

As to the remaining officers, however, Mr. Burns offers no evidence supporting liability. There is no evidence that any of the remaining officers knew that Officer Switzer would deploy his dog or were otherwise integral participants in the dog's deployment. Nor is there any evidence that any of the remaining officers, who were not standing next to Mr. Burns or the dog at the time, had a realistic opportunity to intercede.

The motions of Detectives Loercher, Ramirez, and Hansen, and Officer Montero, for summary judgment as to Mr. Burns's excessive-force claim for the use of the police dog are therefore denied. The motions of all remaining officers for summary judgment as to this claim are granted.

### 4. Mr. Burns's Section 1983 Claim for Deliberate Indifference to His Medical Needs

All defendants have moved for summary judgment with respect to Mr. Burns's claim for deliberate indifference to his medical needs. Mr. Burns cites no credible evidence that meets the standard for this claim, and hence summary judgment for all defendants is appropriate.

#### 4.1 Governing Law

A pretrial detainee in the custody of the state can bring a claim for deliberate indifference to his or her medical needs under the due-process clause of the Fourteenth Amendment, analogous to the right of a criminal convict with respect to his or her medical needs under the Eighth Amendment. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002). "Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Maddox v. City of L.A.*, 792 F.2d 1408, 1415 (9th Cir. 1986) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 245 (1983)).

The standard that a plaintiff must meet to establish a due-process violation under the Fourteenth Amendment is higher than the standard for an unlawful-seizure or excessive-force claim under the Fourth Amendment. Whereas an alleged Fourth Amendment violation is evaluated under a reasonableness standard, *Robinette*, 519 U.S. at 34, "the Due Process Clause is violated by executive action only when it 'can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992)); *accord Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation.") (citing *Lewis*, 523 U.S. at 846). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (citing *Wilkinson*, 610 F.3d at 554).

In the recent *Zion* decision, the Ninth Circuit rejected an argument by a police shooting victim

that the "deliberate indifference" standard should apply after police fired an initial volley of nine shots at him. Instead, the Ninth Circuit applied the heightened "purpose to harm" standard, holding that the police's actions came in rapid succession without time for reflection. *Zion*, 874 F.3d at 1077. Even when the police fired a second volley of nine additional shots at the suspect after he was already on the ground, the Ninth Circuit held that the police's actions should be measured against the "purpose to harm" standard, because "[w]hether excessive or not" for the purpose of a Fourth Amendment excessive-force claim, "the shootings served the legitimate purpose of stopping a dangerous suspect" and therefore were not a Fourteenth Amendment violation. *Id.*

### 4.2 Analysis

The defendants, in their motions, cite to evidence showing that after the shooting, officers approached Mr. Burns to check for vital signs and brought up a medical bag to try to tend to Mr. Burns, and that medical personnel were called to the scene, but they could do nothing for Mr. Burns, who was already deceased.[70] Mr. Burns cites to no credible evidence to support a claim that the officers acted even with deliberate indifference, much less any evidence that meets the higher purpose to harm standard.[71]

In any event, the officers are entitled to qualified immunity. Mr. Burns cites to no controlling cases clearly establishing that the officers' actions here with respect to his medical needs violated his constitutional rights. The Ninth Circuit has addressed situations in which officers were alleged to have been deliberately indifferent to the medical needs of a pretrial detainee held in a state jail pending trial, analogizing the rights under the Fourteenth Amendment of pretrial detainees held in a jail to the rights under the Eighth Amendment of convicted inmates held in a prison. *See, e.g.*, *Gibson*, 290 F.3d at 1187 ("In order to comply with their duty not to engage in acts evidencing deliberate indifference to inmates' medical and psychiatric needs, jails must provide medical staff who are 'competent to deal with prisoners' problems.'") (quoting *Hoptowit v. Ray*, 682 F.2d 1237,

---

[70] Defs.' Burns Mem. – ECF No. 225 at 21–22.

[71] *See* Opp'n – ECF No. 230 at 29–30 (citing no evidence).

1253 (9th Cir. 1982)). But at the time at which Mr. Burns complains that the officers were indifferent to his medical needs, he was not even an arrestee, much less a jailed detainee vis-à-vis whom the police would have a practical opportunity to deliberate. The situation at the time was still an escalating one where officers had to make snap judgments. *See generally Zion*, 874 F.3d at 1077. Mr. Burns cites to no cases that clearly establish that the officers' response to his medical needs in this type of situation was unconstitutional. *Cf. Reyes ex rel. Reyes v. City of Fresno*, No. CV F 13-0418 LJO SKO, 2013 WL 2147023, at *2, 7 (E.D. Cal. May 15, 2013) (holding that allegations that officers fired a volley of shots at suspect and then, after he fell to the ground, fired a second volley of shots at him and then waited several minutes before providing first aid, and that paramedics did not arrive until twenty minutes later, did not plead a valid claim for deliberate indifference to medical needs). In the absence of any controlling cases to the contrary, the officers are entitled to qualified immunity.

For the foregoing reasons, the summary-judgment motions of all officers as to Mr. Burns's claim for deliberate indifference to his medical needs is granted.

## 5. Mr. Burns's State-Law Battery Claim

Detectives Loercher and Ramirez have not moved for summary judgment with respect to Mr. Burns's battery claim. All of the other officers have. Officer Switzer's motion for summary judgment must be denied as to Mr. Burns's battery claim for the dog bite. The motions of all other officers are granted.

### 5.1 Governing Law

"The elements of a battery claim in California are that (1) the defendant intentionally did an act that resulted in harmful or offensive contact with the plaintiff's person, (2) the plaintiff did not consent to the contact, and (3) the contact caused injury, damage, loss or harm to the plaintiff." *Tekle v. United States*, 511 F.3d 839, 855 (9th Cir. 2007) (citations omitted). "The intent necessary to constitute civil battery is not an intent to cause harm, but an intent to do the act which causes the harm." Cal. Civil Jury Instructions § 7.50.

Additionally, "[i]n order to prevail on a claim of battery against a police officer, the plaintiff

bears the burden of proving the officer used unreasonable force." *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1102 (2004) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998)). The test for reasonableness for the purposes of a state-law battery claim against a police officer is the same as that for a Section 1983 claim alleging a violation of the Fourth Amendment. *Id.*

### 5.2 Analysis

Officer Switzer's motion for summary judgment fails. Officer Switzer (1) intentionally did an act — deploying his dog — that resulted in harmful contact with Mr. Burns, (2) to which Mr. Burns did not consent, (3) that caused injury to Mr. Burns. Additionally, as discussed above, there are disputes of material fact as to whether Officer Switzer acted unreasonably. As such, his motion as to Mr. Burns's battery claim for the dog deployment must be denied.

The remaining officers' motions must be granted. While the court is denying the motions for summary judgment of several officers in addition to Officer Switzer as to Mr. Burns's Section 1983 claims for the dog deployment, it does so because there are disputes of material fact as to whether those officers failed to intercede or were liable as supervisors. But failing to intercede or serving as a supervisor are not intentional acts and therefore do not meet the elements of a state-law battery claim. Summary judgment for those officers (and for all other officers) for the battery claim is therefore appropriate.

## 6. Mr. Burns's Parents' Section 1983 Claim for Deprivation of Their Right to Familial Association

Detectives Loercher and Ramirez have not moved for summary judgment with respect to this claim. All of the other officers have. These motions are granted.

### 6.1 Governing Law

The Fourteenth Amendment's substantive due-process clause protects against the arbitrary or oppressive exercise of government power. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). Parents and children may assert Fourteenth Amendment substantive due-process claims if they are deprived of their liberty interest in the companionship and society of their child or

parent through official conduct. *See Lemire v. Cal. Dep't of Corr. & Rehabilitation*, 726 F.3d

1062, 1075 (9th Cir. 2013) (parents and children); *Smith v. City of Fontana*, 818 F.2d 1411, 1418–

19 (9th Cir. 1987); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (parent);

*Crumpton v. Gates*, 947 F.2d 1418, 1421-24 (9th Cir. 1991) (child); *cf. Ward v. City of San Jose*,

967 F.2d 280, 284 (9th Cir. 1992) (sibling has no constitutionally protected interest in brother's

companionship under Section 1983).

As discussed above, "only official conduct that 'shocks the conscience' is cognizable as a due

process violation." *Porter*, 546 F.3d at 1137 (citing *Lewis*, 523 U.S. at 846).

### 6.2 Analysis

Detectives Loercher and Ramirez have not moved for summary judgment with respect to this

claim. All of the non-shooting officers have. For the same reasons as discussed above with respect

to Mr. Burns's individual Fourteenth Amendment claims, those officers are all entitled to

summary judgment with respect to Mr. Burns's parents' Fourteenth Amendment claims, as Mr.

Burns has offered no evidence that any of the non-shooting officers acted with a purpose to harm

him unrelated to legitimate law-enforcement objectives.[72]

### 7. Mr. Lawrence's Section 1983 Claim for Unlawful Seizure, Illegal Detention, False Imprisonment, and Excessive Force

All officers have moved for summary judgment as to Mr. Lawrence's claims. Their motions

must be granted.

As with Mr. Burns, Mr. Lawrence was not actually seized by the police until after he brought

his truck to a stop at the end of the car chase. He therefore cannot maintain a Fourth Amendment

claim (whether stylized as unlawful seizure, illegal detention, or false imprisonment) for the

events that occurred before that time. And by the time he was seized after the car chase, the police

---

[72] If one were to credit Mr. Burns's "kill shot" theory, one could reasonably infer that the officer who fired that shot acted with an intentional purpose to harm him. *Cf. Zion*, 874 F.3d at 1077 (a reasonable jury could infer that a police officer who took a running start and stomped on the head of suspect who had already been shot multiple times and was lying on the ground acted out of a purpose to harm). There is no evidence, however, that any officer other than Detectives Loercher or Ramirez (who are not moving for summary judgment as to this claim anyway) fired any such shot.

had probable cause to arrest him for his reckless driving, *see* Cal. Vehicle Code § 23103, and hence his subsequent seizure and detention were not unlawful. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 323 (2001) (the Fourth Amendment does not forbid warrantless arrests for even minor criminal offenses, such as a misdemeanor seatbelt violation punishable only by a fine). Additionally, the police reasonably believed that Mr. Lawrence had knowingly fled from the police and had rammed a police vehicle, and therefore either had probable cause or reasonably believed they had probable cause to arrest him for those violations as well, and therefore are entitled to qualified immunity. *See Hunter v. Bryant*, 502 U.S. 224, 228 (officers "are entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest [plaintiff]").

As for his excessive-force claim, Mr. Lawrence admitted in his deposition that he suffered no physical injuries and points to no evidence in the record that the police hit him or otherwise used excessive force in seizing him.[73] Summary judgment on behalf of all defendants with respect to Mr. Lawrence's claims is therefore appropriate.

### 8. All Plaintiffs' Claims for Municipality Liability

The City of Concord has moved for summary judgment with respect to all plaintiffs' claims of municipality liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). The plaintiffs have not offered any evidence that meets the standard for imposing municipality liability on the City, and hence the City's motion is granted.

#### 8.1 Governing Law

Liability against a government entity starts from the premise that there is no respondeat superior liability under Section 1983, i.e., no entity is liable simply because it employs a person who has violated a plaintiff's rights. *See, e.g., Monell*, 436 U.S. at 691; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Local governments can be sued directly under Section 1983 only if the public entity maintains a policy or custom that results in a violation of plaintiff's constitutional

---

[73] *See* Opp'n – ECF No. 230 at 42 (citing no evidence).

rights. *Monell*, 436 U.S. at 690–91. To impose *Monell* entity liability under Section 1983 for a violation of constitutional rights, a plaintiff must show that: (1) the plaintiff possessed a constitutional right of which he or she was deprived; (2) the municipality had a policy; (3) this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) the policy is the moving force behind the constitutional violation. *See Plumeau v. School Dist. # 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997); *see also Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("municipal defendants cannot be held liable [where] no constitutional violation occurred").

The Ninth Circuit has explained how a policy may be proved:

> There are three ways to show a policy or custom of a municipality: (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting *Ulrich v. City and Cnty. of S.F.*, 308 F.3d 968, 984–85 (9th Cir. 2002)). The practice or custom must consist of more than "random acts or isolated events" and instead, must be the result of a "permanent and well-settled practice." *Thompson v. City of L.A.*, 885 F.2d 1439, 1443–44 (9th Cir. 1988), *overruled on other grounds by Bull v. City and Cnty. of S.F.*, 595 F.3d 964 (9th Cir. 2010); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Thus, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless" there is proof that the incident "was caused by an existing, unconstitutional municipal policy . . . ." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 (1985).

## 8.2 Analysis

As discussed above, the only constitutional claims that survive summary judgment are (1) Mr. Burns's claims for excessive force against Detectives Loercher and Ramirez for the shooting, and his parents' concomitant familial association claims, and (2) Mr. Burns's claims against Detectives Loercher, Ramirez, and Hansen, Officers Switzer and Montero, and Sergeant White for the dog bite. The plaintiffs do not have any other valid constitutional claims, including any valid constitutional claim regarding the police's investigation leading up to the search warrant, their

1    attempts to execute the search warrant, or the events that followed, including the car chase, up

2    until the shooting. The plaintiffs therefore cannot sustain a claim for municipality liability based

3    on those events either.

4        And the plaintiffs have offered no evidence that the City of Concord has a policy that was the

5    moving force behind either of the two constitutional violations that survive summary judgment

6    (the shooting and the dog bite). The plaintiffs complain that the City of Concord lacks formal

7    policies and fails to train its officers regarding the use and handling of confidential informants,

8    executing search warrants, car pursuits, and traffic stops.[74] But this all addresses the events leading

9    up to the shooting, when no constitutional violation occurred. It does not address, or establish a

10   dispute of material fact, as to whether the City had a policy that was the "moving force" cause

11   behind the shooting or the dog bite.[75]

12       As to the shooting and the dog bite, the plaintiffs offer no evidence. First, the plaintiffs offer

13   no evidence of a longstanding practice or custom regarding police shootings or dog

14   deployments.[76] *Cf. Chew v. Gates*, 27 F.3d 1432, 1442–47 (9th Cir. 1994) (plaintiff may be able to

15   pursue municipality liability for dog bite where he has evidence of police policy on dog bites and,

16   additionally, evidence that the policy was the "moving force" cause of the officers deploying dog

17   on him). Second, the plaintiffs offer no evidence of a decision-making official who was, as a

18   matter of state law, the final policymaking authority in any area of decision, much less any

19   decisions by that official regarding shootings or dog deployments.[77] Third, the plaintiffs present no

20

21   ─────────────────────
     [74] *See* Opp'n – ECF No. 230 at 33–35.

22   [75] Had Mr. Burns submitted to the police immediately and been seized, perhaps he could have
     challenged the police's search warrant or the confidential informants it used and the City's policies
23   regarding the same. Likewise, had Mr. Burns stopped during the car chase and been seized, perhaps he
     could have challenged the way the police conduct car pursuits or traffic stops and the City's policies
24   regarding the same. But because he did not, and therefore was not seized, he cannot bring a claim
     against the officers or the City for these actions. *Cf. McClendon*, 713 F.3d at 1217 ("Th[is] rule . . .
25   creates incentives for future defendants to submit to asserted police authority, thereby avoiding an
     escalation of conflict that could have lethal consequences.").

26   [76] *See* White "Person Most Knowledgeable" Dep. – ECF No. 233-1 at 38–116 (containing no evidence
     regarding City's shooting or dog bite policies) (cited by Opp'n – ECF No. 230 at 33–35).
27
     [77] *See* Opp'n – ECF No. 230 at 33–35 (containing no evidence or argument regarding any decision-
28   making official).

ORDER – No. 14-cv-00535-LB          34

evidence that an official with final policymaking authority delegated that authority to, or ratified the decision of, a subordinate. The plaintiffs raise various complaints about the internal investigation the police conducted regarding the events of that night and asserts that the CPD Chief of Police Guy Swanger signed the final approval of the investigation report after it was completed three years later,[78] but that does not show that Chief Swanger delegated or ratified any decision as to the constitutional violations of which he complains. *See Trevino v. Gates*, 99 F.3d 911, 920–21 (9th Cir. 1996) (ratification may be found where "the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation," but investigation and deliberation "does not amount to ratification"). Finally, the plaintiffs present no evidence that any policy was the "moving force" cause of either the shooting or the dog bite. In the absence of any evidence satisfying the standards for municipality liability, summary judgment in favor of the City is appropriate.[79]

## CONCLUSION

For the foregoing reasons, the court DENIES (1) the motions for summary judgment of Detectives Chris Loercher, Francisco Ramirez, and Mike Hansen, Officers Matthew Switzer and Eduardo Montero, and Sergeant Steven White, as to Mr. Burns's claims under Section 1983 for excessive force for the dog bite, and (2) the motion for summary judgment of Officer Switzer as to Mr. Burns's claims for state-law battery for the dog bite. Those claims, so limited, together with (1) Mr. Burns's claims against Detectives Loercher and Ramirez (a) under Section 1983 for excessive force for the shooting and (b) for state-law battery for the shooting, and (2) Mr. Burns's parents' claims against Detectives Loercher and Ramirez under Section 1983 for deprivation of

---

[78] *See id.* at 36– 40.

[79] Mr. Burns also brings claims against CPD Swanger in addition to the City. To the extent he brings these claims against Chief Swanger in his official capacity, the claims are redundant to his claims against the City and must be dismissed. *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff's Dep't*, 533 F.3d 780, 799 (9th Cir. 2008). To the extent he brings these claims against Chief Swanger in his individual capacity, Chief Swanger (who was not present and had no personal involvement in any of the events at issue here) is entitled to summary judgment for the same reasons as the other non-shooting officers unassociated with the dog bite.

United States District Court
Northern District of California

their right to familial association, may proceed to trial. In all other respects, the defendants'
motions for summary judgment are GRANTED.

   **IT IS SO ORDERED.**

   Dated: November 28, 2017

   _____
   LAUREL BEELER
   United States Magistrate Judge